**In re Howard H. SNYDER, Debtor.**

**J.H. BUHRMASTER COMPANY, INC., Plaintiff,**

v.

**Howard H. SNYDER, Defendant.**

**Bankruptcy No. 94–12078.
Adv. No. 94–91200.**

United States Bankruptcy Court,
N.D. New York.

April 15, 1996.

David L. Ganje, Albany, New York, for plaintiff.

McNamee, Lochner, Titus & Williams (Peter A. Pastore, of counsel), Albany, New York, for Chapter 7 Trustee, Gregory Harris.

Deily, Testa & Dautel, LLP, Linda T. Taverni, Albany, New York, for defendant-debtor.

## MEMORANDUM–DECISION AND ORDER

ROBERT E. LITTLEFIELD, Jr., Bankruptcy Judge.

This adversary proceeding was commenced by J.H. Buhrmaster Company, Inc. ("Plaintiff") against Howard H. Snyder ("Debtor" or "Defendant") seeking nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(4) (11 U.S.C. §§ 101 *et seq.* hereinafter the "Code"). This adversary proceeding falls within the court's core subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(I).

## FACTS

On June 6, 1994 the Debtor filed his voluntary petition seeking relief under Chapter 7 of the Code ("petition date"). Several years prior to the petition date, the Debtor owned and operated a local heating fuel delivery business. The Plaintiff is also engaged in the heating fuel delivery and service business with a number of facilities spread over a large geographic area.

On December 31, 1990 the Plaintiff, as purchaser, and Debtor, as a seller, entered into a written agreement involving the sale of assets, customer lists and business names to Plaintiff ("sale agreement").[1] The parties provided for the continuation of Debtor's businesses as well as the Plaintiff's employment of the Debtor to manage the ongoing business at what then became Plaintiff's Warnerville, New York office ("Warnerville"). Under the sale agreement the Debtor covenanted that he would not operate a competing business in the relevant geographic area, yet retained the right to collect certain outstanding accounts receivable of the businesses acquired by the Plaintiff which existed prior to December 31, 1990.

Almost two years later complaints of customers and accounting inconsistencies indicated to the Plaintiff that problems existed. During October 1992 an officer of the Plaintiff confronted the Debtor with the problems which resulted in the Debtor's general acknowledgement that he had diverted to his own use payments due to Plaintiff in an unspecified amount and his resignation (on October 5, 1992) as manager of Plaintiff's Warnerville facility (the period from January 1, 1991 to October 5, 1992 hereinafter referred to as the *"management period"*).

During the management period the daily totals, inventory records and sales entries into the journals at Warnerville were supervised and managed by Debtor. (Stipulation

---

1. The Debtor actually executed the sales agreement on behalf of himself, individually, as well as his corporate entities Snyder Heating Fuels, Inc. and Berard Oil Co., Inc. Under the sales agreement, the Debtor, Snyder Heating Fuels, Inc. and Berard Oil Co., Inc. were all designated as the "Seller." (Pl.Ex. 2). Both Snyder Heating Fuels, Inc. and Berard Oil Co., Inc. ceased operating after the December 1990 sales agreement. (See Stipulation of Facts filed November 21, 1995 at ¶¶ 31, 38). Following the sale, Plaintiff also acquired the service and installation business of Alliance Service, Inc., a general heating, service and repair business in which Debtor had a one-third interest. (*Id.* at ¶ 51, 54).

of Facts filed November 21, 1995 at ¶ 49). The Debtor also was in charge of bookkeeping entries, recording daily cash receipts, receiving monies and issuing invoices to customers. (*Id.* at ¶ 56, 62). Although Debtor agreed not to compete with the Plaintiff, during the management period the Debtor continued to use bills and invoices from Debtor's prior businesses.

The parties executed a document entitled "Supplemental Agreement" dated October 16, 1992 in which Debtor, *inter alia,* acknowledged his receipt of payments from Plaintiff's customers and his failure to have them "properly placed to the credit of [Plaintiff]" during the management period. (Pl.Ex. 7 at ¶ 2). In recognition that the amount of Debtor's diversion or embezzlement had not been investigated or ascertained, the Supplemental Agreement also provided that Plaintiff would be provided with access to whatever books and records were needed. (*Id.*)

Plaintiff commenced the instant adversary proceeding by complaint filed on November 14, 1994 seeking the nondischargeability of Debtor's debt in the amount of $700,686.46 plus prejudgment and postjudgment interest, accountants' and attorneys' fee, costs and expenses pursuant to Code § 523(a)(4). Debtor answered and asserted two counterclaims: (1) that Plaintiff's action is "groundless and completely without merit and ... was commenced to harass and intimidate" the Debtor entitling Debtor to sanctions for a "frivolous" action, and (2) that Plaintiff's failure to make payments to Debtor post-petition under the gallonage agreement constitutes a violation of Code §§ 362 and 553 thereby entitling Debtor to actual and punitive damages under Code § 362(h). Plaintiff filed a timely reply to Debtor's counterclaims which contends, *inter alia,* that the Chapter 7 Trustee alone is entitled to the payments under the so-called gallonage agreement and therefore the Debtor lacks standing to claim damages by Plaintiff's failure to pay same.

Louis H. Buhrmaster, treasurer of Plaintiff since 1964 ("Buhrmaster") testified at trial that he and Plaintiff's employees were involved initially in researching the extent of Debtor's misappropriation. He testified that the Warnerville facility was one of four loca-

tions where Plaintiff conducted business involving heating fuel, service and installation. As of the date of sale, the Debtor exclusively used his own computerized operating and accounting system. According to Buhrmaster, the Debtor was permitted to continue using that system post-sale during the management period until Warnerville could change over to an accounting system compatible with the Plaintiff's system. Buhrmaster testified that the Debtor's computer system was still being used exclusively when the embezzlement was discovered but he and Plaintiff's employees were unable gain access to the records (if, any) maintained on Debtor's computer.

Buhrmaster testified that the Plaintiff's analysis of gross profits showed significant differences between Plaintiff's other locations (26.9%) and the Warnerville facility during the management period (6%), while the pre-sale gross profit for the Warnerville facility was over 20%. He also testified that the gross profit for the Warnerville facility following the management period during 1993 was 30%. According to Buhrmaster, on a monthly basis during the management period the Debtor would forward to the Plaintiff general ledger entries.

During December 1994, following an initial review of various books and records by Plaintiff's employees, Plaintiff retained the services of Leonard W. Vona, a certified public accountant and certified fraud examiner ("Vona"), to conduct a review of the records and render an opinion on the amount and source(s) of the Plaintiff's loss. Vona conducted reviews of the books and records located at the Warnerville facility (for periods before, during and after the sales agreement), bank accounts and corporate accounts receivable and Plaintiff's books and records. His analysis and conclusions are set forth in his written report filed on November 29, 1995 ("Report" or "Pl.Ex. 1").

At trial on December 7th and 8th, 1995, Vona testified that the accounting records for the management period maintained by the Debtor at the Warnerville facility were both incomplete and unreliable. According to Vona, this was due to a combination of factors including: (1) unrecorded sales transac-

tions conducted by the Warnerville, (2) sales invoices during the management period that were missing and unaccounted for and sales by the Plaintiff's Warnerville facility which were not recorded in the accounting records, (3) the billing for services rendered by Plaintiff using billing head and invoices from the Debtor's prior businesses, and (4) Debtor's ability, due to his management position, to process sales transactions without leaving records of the transactions. See Report at chapter II, § 3.3.

Vona testified that, based upon his review of the available accounting records at the Warnerville facility, the only reliable records reflecting actual transactions during the management period are the inventory and purchase records maintained by the Plaintiff. Since the Plaintiff was the exclusive source of inventory at the Warnerville facility during the management period, Vona obtained the amounts of inventory used by the Warnerville facility and computed the expected gross profit from the inventory based upon historical gross profit data relating to the Warnerville facility for periods both before and after the management period. He compared the expected gross profit (aggregating $790,810) to the actual profit in each category of inventory or service during the management period (aggregating $333,420). Through deductive reasoning, Vona opined that the excess of expected gross profit over actual gross profit constitutes the amount of Plaintiff's loss caused by Debtor (approximately $457,-000). See Report at chapter IV.

Vona also testified that a review of post-sale activity of the bank accounts maintained under the names of Debtor's pre-sale businesses, to wit, Snyder Heating Fuel, Inc. ("SHF") and Berard Oil Co., Inc. ("Berard") (together the "accounts"), evidenced Debtor's diversion of customers' payments to the Plaintiff totaling approximately $161,000 which he deposited into the bank accounts. See Report at chapter III. The Debtor stipulated that he used Plaintiff's funds and proceeds from invoices to pay SHF's and Berard's corporate taxes, mortgages and insurance policies. See Stipulation of Facts filed November 21, 1995 at ¶¶ 83–86. He also concedes that he obtained proceeds due

Plaintiff by conducting business under the name of his pre-sale entities and "wrongfully deposited" same into the SHF and Berard bank accounts. *Id.* at ¶ 74.

While the Debtor contends that the Plaintiff has failed to establish Debtor's embezzlement of funds over $80,342 (see Defendant's proposed findings of fact and conclusions of law dated December 21, 1995 at ¶ 2) he admits that he "misappropriated moneys belonging to Plaintiff" in the amount of $66,652. *Id.* at ¶ 5. Plaintiff maintains that it has established its loss of funds caused by the Debtor in the amount of $457,000.

## DISCUSSION

### I.

In light of Debtor's concession that he has "misappropriated" Plaintiff's funds during the management period in an unknown amount, the court's role is to determine the amount of Plaintiff's loss.

■ In order to prevail against the Debtor on its claim under Code § 523(a)(4), the burden is on the Plaintiff to establish its claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Here, although the Plaintiff has been partially relieved of its burden to prove that the Debtor embezzled funds, it is still required to show by a preponderance of evidence, the extent of the loss caused by Debtor. The inherent difficulty in discovering and piecing-together transactions *ex post facto* is more difficult here, where the Debtor, himself, did not produce sufficient source documents quantifying his misappropriation or an accounting summarizing same. Unfortunately, the records which should reflect the actual transactions at the Warnerville facility during the management period are unreliable.

The only evidence offered by Debtor which was probative of the extent of Plaintiff's loss was the July 19, 1994 letter (with attachments) from L.H. Buhrmaster to Debtor's attorney that included, *inter alia,* a document entitled "Snyder unresolved items" consisting of a list of Plaintiff's customers' accounts experiencing undocumented shortages during the management period totaling $80,-

342. See Debtor's Exhibit "A". The Debtor contends that July 19, 1994 letter is Plaintiff's only accounting of the misappropriated funds and therefore establishes that the maximum amount of loss is $80,342.

■ The court disagrees. First, Debtor's contention that the July 19, 1994 letter is the Plaintiff's only evidence of its losses ignores that the letter was generated by the Plaintiff through its employees' efforts prior to their retaining Vona's accounting services. Second, a fair reading of the July 19, 1994 letter does not lead to the conclusion that Plaintiff's losses are limited to $80,342. It also refers to missing receipts, unrecorded sales and services and a discrepancy of gross profit margin between Plaintiff (26.9%) and the Warnerville facility (6.0%), thereby referring to then-unascertained losses. Thus the Debtor's contention that the July 19, 1994 letter, in effect, acts as an evidentiary cap of $80,342 on the Plaintiff's losses, is without merit.

■ The court finds that the Plaintiff has satisfied its burden of showing losses caused by Debtor's embezzlement in the amount of $457,000. The record reflects that the inability to document Plaintiff's losses is due to Debtor's own acts and omissions as the person at the Warnerville facility with the responsibility for financial and operational oversight during the management period. The incomplete condition of the document trail of transactions cannot be Debtor's principal weapon to defeat the Plaintiff. As the court in *Schoenholtz v. Doniger,* 657 F.Supp. 899 (S.D.N.Y.1987) observed, "it is the defendants—not plaintiff—who must bear the risk of any uncertainty which their wrong has created." *Id.* at 908. Where the nature of the injury inhibits the calculation of damages, "it would be a perversion of fundamental principles of justice to deny all relief to the injured person ...", thereby rewarding the Debtor for his undisclosed transactions, failure to keep regular business records and successful concealment of proceeds. *Id.* quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). Therefore, the court is not limited by Plaintiff's ability to trace only the sum of $161,000

through Debtor's business accounts. See Report, chapter III.

■ The "gross profit analysis" method of calculating the losses caused by Debtor, employed here by Vona on behalf of Plaintiff, is not grounded on the certainty that comes with source documents underlying transactions. See Report, chapter IV. Indeed, it is an inferential technique utilized where direct evidence of transactions is incomplete or unreliable. A court is not precluded from engaging "in some degree of speculation in computing the amount of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing." *Burndy Corporation v. Teledyne Industries, Inc.,* 748 F.2d 767, 771 (2d Cir.1984) citing *Stevens Linen Associates, Inc. v. Mastercraft Corp.,* 656 F.2d 11, 14–15 (2d Cir.1981). However, it appears that Plaintiff's calculation of losses in terms of expected gross profits on certain inventory and services is based on reasonably well founded historical data. See *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (future profits may be shown by historical data).

■ In the court's view, the Plaintiff's gross profit analysis is not based upon "mere speculation or guess" (*Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250), but rather, upon "just and reasonable inference...." *Id.* Buhrmaster testified that they recorded the Warnerville inventory at the beginning and at the end of the management period. Vona's conclusion that the Debtor's misappropriated $457,000 of Plaintiff's funds is based upon the theory that losses may be reasonably calculated if you know the amount and cost of inventory and services expended and reliable historical data regarding profits on the same inventory and services in the same area. See Report, chapter IV. The difference between estimated gross profits and actual gross profits is a reliable and reasonable measurement of loss. The fact that Debtor disputes the magnitude of the loss set forth in the Report does not sufficiently controvert the results therein.

Accordingly, the court concludes that the Plaintiff has satisfied its burden of showing

that Debtor embezzled Plaintiff's funds in the amount of $457,000.

## II.

The Debtor has counterclaimed against the Plaintiff seeking 1) sanctions for its "frivolous" adversary proceeding and 2) damages for Plaintiff's violation of the automatic stay. Each of those counterclaims shall be dismissed for the reasons that follow.

■ The Debtor's first counterclaim is not supported by the record. In the instant case the Debtor has conceded misappropriation of property and funds of the Plaintiff. The Debtor has also failed to provide his own accounting or that of an expert to controvert Plaintiff's relatively weighty evidence of misappropriation caused by Debtor during the management period. Clearly, in view of the court's analysis and conclusions, *infra*, it cannot conclude that the Plaintiff's instant adversary proceeding is "frivolous" or otherwise justifies sanctions. Accordingly, Debtor's first counterclaim is without merit.

The Debtor's second counterclaim against Plaintiff is based upon the Debtor's right to receive gallonage payments from Plaintiff post-petition. The Debtor asserts that the Plaintiff's withholding from him of gallonage payments post-petition constitutes an improper set off and a violation of the stay entitling the Debtor to damages under Code § 362(h). There are several problems with Debtor's argument.

On or about December 8, 1995 the parties agreed to permit the intervention of the Chapter 7 trustee Gregory Harris through his special counsel ("Trustee"). The court entered its Order of the same date which provides for the Trustee's intervention as a "party in interest by and on behalf of all parties with any claim to gallonage commissions and as the assignee of all interests in gallonage commissions due under the" December 30, 1990 sale agreement ("December 8, 1995 Order"). This recognized the assignments by Snyder Heating Fuels and Berard Oil Company to the Trustee (on the eve of trial) of their right to receive gallonage payments from the Plaintiff. The December 8,

1995 Order further provided that the Court may "reduce and/or eliminate" Plaintiff's gallonage liability by the amount that it determines as nondischargeable.

■ Upon the filing of Debtor's voluntary petition under Chapter 7, he was divested of his equitable and legal interest in gallonage payments. As a consequence, the Trustee acquired, for the benefit of the estate, the Debtor's right to receive gallonage payments or to sue based upon failure to receive same. See Code § 323. Therefore the Debtor did not, and does not, have standing to assert his second counterclaim relief for which must be predicated upon a showing of "actual damage." See Code § 362(h). Accordingly, the Debtor's second counterclaim shall be dismissed.

## III.

Having determined the amount of the nondischargeable loss caused by Debtor to Plaintiff, the court turns to the issue presented by virtue of the Court's December 8, 1995 Order, to wit, the amount by which the Plaintiff's gallonage liability to the estate is affected by the amount that the court has determined above to be nondischargeable under Code § 523(a)(4).

■ While the record contains evidence of the Plaintiff's total gallonage liability through September 1995, neither party has offered the Plaintiff's gallonage for the three remaining months (October through December) of 1995. As a result, the court will use only the Plaintiff's total gallonage liability supported by the evidence. According to the "retained gallonage summary" offered by the Debtor (Def.Ex. "F"), the Plaintiff's net obligation through September 1995 was $249,-413.56. Because the amount of the loss to Plaintiff caused by the Debtor ($457,000) exceeds Plaintiff's gallonage liability to the estate, the Plaintiff's obligation to the estate in the amount of $249,413.56 shall be eliminated in full. The Plaintiff shall be entitled to a nondischargeable judgment against Debtor for the amount of the excess of its loss over its gallonage liability to the estate.[2]

---

**2.** The amount by which the Plaintiff's loss ($457,- 000) exceeds the Plaintiff's gallonage obligation

IV.

Each of the parties is requesting interest, costs and attorneys' fees. This court adheres to the policy that interest and attorneys' fees are generally not recoverable in the context of a dischargeability action absent a valid and enforceable contractual right. See *Members Credit Union v. Kellar (In re Kellar)*, 125 B.R. 716, 720–21 (Bankr. N.D.N.Y.1989). Here, neither of the parties have argued that the December 1990 sale agreement (or any other agreement) provides for interest on the gallonage obligation or the amount determined to be nondischargeable. Accordingly, the requests of the parties for same shall be denied.

Based upon the foregoing, it is hereby ORDERED, that:

1. Plaintiff is awarded judgment against Debtor in the amount of $207,586.44 and said judgment is nondischargeable pursuant to Code § 523(a)(4);

2. Debtor's first and second counter-claims against Plaintiff are hereby dismissed;

3. Plaintiff's gallonage liability to the Debtor's estate is eliminated to the extent of $249,413.56; and

4. The parties' respective requests for interest, expenses and fees are hereby denied.

through September 1995 ($249,413.56) is $207,- 586.44.