**In re Alex Mayard ZOLDAN, Debtor.**

**Robert ZOHLMAN, Plaintiff,**

**v.**

**Alex Mayard ZOLDAN, Defendant.**

**Bankruptcy No. 96 B 20879(ASH).
Adversary No. 96–5201A.**

United States Bankruptcy Court,
S.D. New York.

April 6, 1998.

evidence of threatened irreparable harm, *see Bear U.S.A.*, 909 F.Supp. at 910, there is no such evidence here.

Hershman & Leicher, P.C., by Harold M. Hershman, New York City, for Plaintiff.

Jeffrey L. Sapir, White Plains, NY, for Defendant–Debtor.

### DECISION ON DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(4)

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

On October 13, 1992 a judgment was entered in the Supreme Court of the State of New York, County of Westchester, in the amount of $304,371.78 in favor of the plaintiff in this adversary proceeding, Robert Zohlman ("Zohlman"), against defendant/debtor, Alex Mayard Zoldan ("Zoldan"). Together with statutory interest, the judgment indebtedness is approximately $414,000. On May 8, 1996 Zoldan filed a petition under Chapter 7 in this Court. Zohlman timely commenced this adversary proceeding seeking a determination that the judgment indebtedness is non-dischargeable under 11 U.S.C. § 523(a)(4). The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The following are the Court's findings of fact and conclusions of law after trial under Bankruptcy Rule 7052.

### Background

Zoldan and Zohlman executed an Amended and Restated Certificate of Limited Partnership and an Amended and Restated Agreement of Limited Partnership of New City Associates each dated as of May 27, 1981. New City Associates (the "Partnership") was organized to acquire, renovate and operate an existing office building located at 120 North Main Street, New City, New York (the "Office Building"). Zoldan was the sole general partner of the Partnership. Zohlman was one of six limited partners, having by far the largest limited partnership interest. Article THIRTEENTH of the Partnership Agreement provided in paragraph A that the

general partner, Zoldan, "shall·devote such time to the business affairs of the Partnership as shall be necessary to insure the efficient management thereof," but that Zoldan was not entitled to salary or other compensation for his services as general partner. However, paragraph B of Article THIRTEENTH, enumerating the powers of the general partner, authorized Zoldan to hire himself or any affiliate of his as "Managing Agent" of the Office Building for an annual fee not to exceed four percent of the gross income of the Building and an initial rent-up supervisory fee of $25,000. In accordance with this provision, Zoldan hired himself as Managing Agent of the Office Building and acted in that capacity at all relevant times.

The Partnership acquired, renovated, leased out and operated the Office Building, which was sold in 1987, apparently at a profit to the investors.

At some point prior to or in connection with the sale of the Office Building, Zoldan and Zohlman· had a falling·out. Zohlman commenced the state court action against Zoldan in the form of a "special proceeding" for an accounting, to which Zoldan consented. By order of reference dated January 15, 1988, Justice Harold L. Wood appointed Herman Geist, Esq. as Referee pursuant to Civil Practice Law and Rules § 4311 to "supervise the auditing and examination of·the books and records" of the Partnership. The Referee submitted a Report of Referee dated March 30, 1992 (the "Referee's Report" or "Report").

The Referee's Report focused on fifteen specific items, lettered "A" through "O;" aggregating $502,766 which were in dispute between the parties as a consequence of the examination of· the Partnership books and records covering the nearly six years from 1981 through 1987. The Report set forth the Referee's conclusions with respect to each of the fifteen items, resulting in surcharges against Zoldan in the aggregate sum of $421,185. Certain credits to Zoldan resulted in a net surcharge of $289,021. The Referee's Report was approved by Justice Wood, who signed the judgment entered October 13, 1992 in the amount of $304,371.78 including interest, costs and disbursements.

### Section 523(a)(4); Contentions of the Parties

Section 523(a)(4) of the Bankruptcy Code provides that a discharge under Section 727 does not discharge an individual debtor from any debt

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny [.]

There is no claim that Zoldan committed any act of embezzlement or ·larceny giving rise to the state court judgment. Nor is there any contention that the judgment was based upon fraud or that Zoldan committed fraud in connection with any of the transactions giving rise to the judgment.

Accordingly, Zohlman's claim for non-dischargeability under Section 523(a)(4) is based upon the language "defalcation while acting in a fiduciary capacity." The parties differ sharply on the statutory interpretation to be accorded the words "defalcation" and "fiduciary." Zohlman contends that the relationship between partners in New York is that of fiduciaries with respect to each other by reason of Section 43 of the New York Partnership Law ("NYPL"), from which premise he asserts that all funds of the Partnership were· trust funds. Zohlman argues further that "defalcation" under Section 523(a)(4) means "any failure, innocent or otherwise, by a fiduciary to account for, or pay over, trust funds."

Zoldan argues that NYPL § 43 does not create an express or technical trust, but merely a trust *ex maleficio,* which is not a fiduciary relationship within the meaning of Section 523(a)(4). Further, Zoldan asserts that the contract in question, at least in its relevant provisions, is simply an ordinary commercial contract for the management of property, namely the, Office Building, and that the terms of the Partnership Agreement are fundamentally inconsistent with the type of fiduciary relationship contemplated by Section 523(a)(4). Zoldan argues that the term "defalcation" connotes some element of misconduct or wrongdoing and that no such element can be found in the Referee's Re-

port, the state court order and judgment approving it or at the trial in this Court.

### Governing Legal Principles

#### The discharge in bankruptcy

Initially, it is important to take stock of the importance of the issue before this Court. The discharge of debts or "fresh start" is undoubtedly the philosophical and practical centerpiece of the Bankruptcy Code. In one of the earliest Supreme Court decisions dealing with the Bankruptcy Act, Justice Day remarked that the systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive, and to permit him to have a fresh start in business or commercial life, freed from the obligations and responsibilities which may have resulted from business misfortunes. *Wetmore v. Markoe*, 196 U.S. 68, 77, 25 S.Ct. 172, 176, 49 L.Ed. 390, 394 (1904). Again in 1934 the Supreme Court said:

> This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns *at the time of bankruptcy*, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. The various provisions of the bankruptcy act were adopted in light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act.

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 1235–36 (1934) (internal citations omitted) (emphasis in original). Congress reiterated this viewpoint when it passed the Bankruptcy Reform Act in 1978, commenting that discharge is "the heart of the fresh start provisions of the bankruptcy law." *Matter of Martonak*, 67 B.R. 727, 728 (Bankr.S.D.N.Y.1986) (quoting 11 U.S.C. § 727 H.R. no. 595, 95th Cong., 1st Sess. 384 (1977); S.R. No. 989, 95th Cong., 2d Sess. 98 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5884, 5963, 6340).

It follows that non-dischargeability is "perceived to be a punitive exception to the 'fresh start' policy and should be found reluctantly." *Matter of Martonak*, 67 B.R. at 728 (citing *In re Huff*, 1 B.R. 354, 357 (Bankr.D.Utah 1979); *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)); *accord In re Harron*, 31 B.R. 466, 468 (Bankr.D.Conn.1983). The courts have repeatedly stressed that the Section 523(a) exceptions to discharge must be strictly construed to comport with the "fresh start" philosophy underlying the Bankruptcy Code. *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986) ("Because of the very nature and philosophy of the Bankruptcy law the exceptions to dischargeability are to be construed strictly"); *Household Finance Corp. v. Danns (In re Danns)*, 558 F.2d 114, 116 (2d Cir.1977) (interpreting Section 17(a), the predecessor of Section 523) ("exceptions to discharge are to be narrowly construed"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir.1996); *Shearson Lehman Hutton, Inc. v. Schulman (In re Schulman)*, 196 B.R. 688, 693 (Bankr.S.D.N.Y.1996); *Kuper v. Spar (In re Spar)*, 176 B.R. 321, 326 (Bankr. S.D.N.Y.1994) ("To meet the goals intended under the Code, exceptions to discharge must be strictly and literally construed against the creditor and liberally construed in favor of the honest debtor"); *Hudson Valley Water Resources, Inc. v. Boice (In re Boice)*, 149 B.R. 40, 43 (Bankr.S.D.N.Y.1992) ("Exceptions to dischargeability are construed strictly against the creditor and liberally in favor of the debtor to accomplish bankruptcy's 'fresh start' goal"); *Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 421 (Bankr.S.D.N.Y.1991); *In re Materetsky*, 28 B.R. 499, 501 (Bankr. S.D.N.Y.1983); *Boyle v. Abilene Lumber, Inc. (Matter of Boyle)*, 819 F.2d 583, 588 (5th Cir.1987); *AT & T Universal Card Servs. Corp. v. Akdogan (In re Akdogan)*, 204 B.R. 90, 95 (Bankr.E.D.N.Y.1997); *First American Bank of New York v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 27 (Bankr. E.D.N.Y.1994).

#### The meaning of "fiduciary"

The terms "defalcation" and "fiduciary" as used in Section 523(a)(4) have been the sub-

ject of much litigation and numerous decisions, some conflicting.

■ A threshold question is whether the meaning of these words is to be determined as a matter of federal or state law. Not surprisingly, the courts have concluded that the statutory interpretation of a federal statute is a matter of federal law, although the federal courts may look to state law for context and guidance in making the determination. *See Angelle v. Reed (Matter of Angelle),* 610 F.2d 1335, 1341 (5th Cir.1980); *Stone v. Stone (In re Stone),* 94 B.R. 298, 302 (S.D.N.Y.1988), *aff'd* 880 F.2d 1318 (2d Cir. 1989); *Runnion v. Pedrazzini (In re Pedrazzini),* 644 F.2d 756, 758 (9th Cir.1981); *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir. 1986); *In re Gans,* 75 B.R. 474, 489 (Bankr. S.D.N.Y.1987); *Lee–Benner v. Gergely (In re Gergely),* 110 F.3d 1448, 1450 (9th Cir.1997); *see also Shearson Lehman Hutton, Inc. v. Schulman (In re Schulman),* 196 B.R. 688, 696–97 (Bankr.S.D.N.Y.1996); *Discount Home Center, Inc. (In re Turner),* 134 B.R. 646, 649 (Bankr.N.D.Okl.1991) ("Apparently both State and Federal law must be consulted, and somehow accommodated, to determine whether a given relationship is or is not a "fiduciary capacity" for purposes of 11 U.S.C. § 523(a)(4)"). In the context of the term "fiduciary," the somewhat ambiguous interplay of federal and state law was articulated by the Fifth Circuit as follows in *Matter of Angelle:*

> We think it essential to clarify the precise role of state law and in so doing, to summarize the above analysis. To begin with, the scope of the concept fiduciary under § 17a(4)[1] is a question of federal law.... Thus, regardless of how a state defines fiduciary, the *Chapman/Davis* definition applies in cases involving § 17a(4).
>
> On the other hand, state law takes on importance in determining when a trust exists. The state may impose trust-like obligations on those entering into certain kinds of contracts, and these obligations may make a contracting party a trust-

ee.... We also believe that state law may play importance in determining whether a specific case involves an express trust.

610 F.2d at 1341.

■ The concept of fiduciary under Section 523(a)(4) and its predecessor statute, Bankruptcy Act § 17a(4), is far narrower in scope than under state law. The type of trust which will give rise to a fiduciary relationship under Section 523(a)(4) is limited by case law to "express" or "technical" trusts, and excludes trusts which may be implied by law or created by statute on the basis of wrongful conduct (*ex maleficio*). The leading decision on this point is *Davis v. Aetna Acceptance Co., supra.* Writing in 1934 of Bankruptcy Act § 17a(4), the Supreme Court said:

> The meaning of these words ["acting in a fiduciary capacity"] has been fixed by judicial construction for nearly a century. *Chapman v. Forsyth,* 2 How. 202, 11 L.Ed. 236, decided in 1844, is a decision to the effect that, within the meaning of a like provision in the Act of 1841, a factor does not act in a fiduciary capacity; the statute "speaks of technical trusts, and not those which the law implies from the contract." 2 How. at page 208, 11 L.Ed. 236. The scope of the exception [to discharge] was to be limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. [numerous citations omitted] It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto. In the words of Blatchford, J.: "The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created." [Citation omitted]

293 U.S. at 333, 55 S.Ct. at 153–54, 79 L.Ed. at 397–98. Following this precept and noting the congruence of a strict interpretation of

---

1. Section 17a(4) of the Bankruptcy Act is the predecessor of, and substantially the same as in material respect, Section 523(a)(4) of the Bankruptcy Reform Act of 1978. Section 17a(4) provided for nondischargeability of debts "created by [the debtor's] ... defalcation while ... acting in any fiduciary capacity."

the exception to discharge with the remedial purpose of the fresh start, the District Court in *In re Stone* said:

> Moreover, we underscore that the concept of fiduciary embodied in section 523(a)(4) is more narrowly confined than is its common- or state-law relatives. Springing from the Supreme Court's decision in *Davis v. Aetna Acceptance Co.* [citation omitted], it has been said that section 523(a)(4) speaks only in terms of technical or express trusts, and that constructive, resulting, or implied trusts do not fall within section 523(a)(4)'s ambit. [citations omitted] Put differently, the debtor must serve as a technical trustee prior to and independent of the debt incurred by fraud or defalcation. [citations omitted] Given this limitation, the defalcation exception to discharge remains sufficiently circumscribed and in harmony with the remedial purposes of the Bankruptcy Code.

94 B.R. at 302. To the same effect *see In re Pedrazzini*, 644 F.2d at 758; *In re Angelle*, 610 F.2d at 1339 ("These Supreme Court cases giving limited meaning to the term fiduciary are entirely consistent with—and indeed, serve to promote—the Bankruptcy Act's very purpose, which is 'to give the debtor a "new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." ' [citations omitted] These cases are also consistent with the well-established principle that exceptions to discharge should be limited to those clearly expressed in the statute [citation omitted]"). As stated in *Windsor v. Librandi (In re Librandi)*, 183 B.R. 379, 382 (M.D.Pa.1995):

> The traditional definition of fiduciary, involving a person who stands in a special relationship of trust, confidence, and good faith, is 'far too broad for the purposes of bankruptcy law.' ... Rather, beginning with the Supreme Court decisions ... courts have held that the fiduciary relationship referred to in section 523(a)(4) is limited to instances involving express and 'technical' trusts.

*Accord, First Options of Chicago v. Kaplan (In re Kaplan)*, 162 B.R. 684, 704 (Bankr. E.D.Pa.1993), *aff'd* 189 B.R. 882 (E.D.Pa.

1995), *reconsideration denied*, 198 B.R. 91 (E.D.Pa.1996); *Peerless Insurance Co. v. Casey (In re Casey)*, 181 B.R. 763, 766 (Bankr. S.D.N.Y.1995); *Matter of Marchiando*, 13 F.3d 1111, 1115 (7th Cir.1994), *cert. denied*, 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994); *Parrotta v. Rausch (Matter of Rausch)*, 49 B.R. 562, 564–65 (Bankr.D.N.J. 1985); *In re Schultz*, 46 B.R. 880, 884–87 (Bankr.D.Nev.1985); *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 983–91 (Bankr.N.D.Ind. 1988); *Air Traffic Conference of America v. Paley (In re Paley)*, 8 B.R. 466, 468–69 (Bankr.E.D.N.Y.1981); 4 *Collier on Bankruptcy*, § 523.10[1][c] (15th Ed. rev.1996).

▮ In applying the principles articulated by the Supreme Court in the *Davis* case, the courts have not always reached consistent results. *See*, for example, the analysis in *Matter of Angelle*, 610 F.2d at 1340–41. Of particular relevance to this case are the authorities relating to relationships among partners. It has been said that "unless there exists some additional fact, Section 523(a)(4), as it relates to a debtor acting in a fiduciary capacity, does not generally apply to frauds of ... partners." *Collier, id.* at ftn. 15. However, the *Norton* treatise states that "[a] general partner in a limited partnership is properly viewed as owing a fiduciary duty to limited partners which will be recognized under Code s 523(a)(4)." 3 *Norton Bankr.L. & Prac.* § 47:26 (2d ed. Supp.1997).

In this case, Zohlman places heavy reliance on NYPL § 43, which provides:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property.

The courts have reached differing conclusions as to whether the local Uniform Partnership Act provision analogous to NYPL § 43 gives rise to a fiduciary relationship within the restricted definition of the Supreme Court in the *Davis* case. The following cases held that neither the partnership statute analogous to NYPL § 43 nor state case law created a fiduciary relationship within the meaning of Section 523(a)(4):

*Blashke v. Standard (In re Standard)*, 123 B.R. 444, 454 (Bankr.N.D.Ga.1991) (Georgia law); *Rolley v. Spector (In re Spector)*, 133 B.R. 733, 739–40 (Bankr.E.D.Pa.1991) (Pennsylvania law); *Betz v. Gay (Matter of Gay)*, 117 B.R. 753, 754–55 (Bankr.M.D.Ga.1989) (Georgia law); *Moore v. Holman (In re Holman)*, 42 B.R. 848, 850–51 (Bankr.E.D.Mo.1984) (Missouri law); *Huhman v. Braudis (In re Braudis)*, 86 B.R. 1001, 1003–04 (Bankr.W.D.Mo.1988) (Missouri law, except possibly as to managing partners); *Donohoe v. Hurbace (In re Hurbace)*, 61 B.R. 563, 566 (Bankr.W.D.Texas 1986) (Texas law); *Medved v. Novak (In re Novak)*, 97 B.R. 47, 59–60 (Bankr.D.Kan.1987) (Kansas law); *Arnett v. Weiner (In re Weiner)*, 95 B.R. 204, 205–07 (Bankr.D.Kan.1989) (Kansas law); *Reiter v. Napoli (In re Napoli)*, 82 B.R. 378, 381–82 (Bankr.E.D.Pa.1988) (New Jersey law); *Sulphur Partnership v. Piscioneri (In re Piscioneri)*, 108 B.R. 595, 601–02 (Bankr.N.D.Ohio 1989) (Ohio law); *Sager v. Lewis (In re Lewis)*, 94 B.R. 406, 408–10 (Bankr.E.D.Va.1988) (Virginia law); *Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 854 (Bankr.E.D.Va.1986) (Virginia law, following *In re Holman*); *Dreyfoos v. Ryan*, 90 B.R. 554, 556 (Bankr.S.D.Fla.) (Florida law); *McClain v. Elliott*, 66 B.R. 466, 467 (Bankr.S.D.Fla.1986) (Florida law); *Barker v. Clemens (In re Clemens)*, 83 B.R. 945, 951 (Bankr.N.D.Ohio 1988) (Ohio law). Generally speaking, these cases hold that the statute (NYPL § 43 as enacted in other states) gives rise to a trust *ex maleficio*, and not an express or technical trust as required by *Davis*. *See also Coleman v. Choisnard (In re Choisnard)*, 98 B.R. 37, 40 (Bankr.N.D.Okla.1989); *Joseph v. Stone (In re Stone)*, 91 B.R. 589, 593–94 (D.Utah 1988); *BAMCO 18 v. Reeves (In re Reeves)*, 124 B.R. 5, 9–11 (Bankr.D.N.H.1990).

For contrary authority, *see Holmes v. Kraus (In re Kraus)*, 37 B.R. 126, 130 (Bankr.E.D.Mich.1984) (Uniform Partnership Act provision substantially identical to NYPL § 43 "established an *express trust* for which each partner acts as a trustee. The trust is created before the act creating the debt and without any reference to that debt. [The Michigan statute] satisfies the ... criteria for establishing a fiduciary relationship");

*Landvest Associates v. Owens (In re Owens)*, 54 B.R. 162, 165 (Bankr.D.S.C.1984) (following *Kraus* without analysis); *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 991 (Bankr.N.D.Ind.1988) (following *Kraus* under Indiana law after lengthy analysis of the cases); *see also Inahara v. Harris (In re Harris)*, 458 F.Supp. 238, 243 (D.Or.1976), *aff'd mem.* 587 F.2d 451 (9th Cir.1978), *cert. denied*, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); *Longo v. McLaren (In re McLaren)*, 136 B.R. 705, 714 (Bankr.N.D.Ohio 1992), *aff'd*, 3 F.3d 958 (6th Cir.1993); *Getaz v. Stewart (In re Stewart)*, 123 B.R. 817, 820 (Bankr.W.D.Tenn.1991); *see also Gravel v. Chris J. Roy, A Law Corp. (In re Chris J. Roy, A Law Corp.)*, 130 B.R. 214, 219 (Bankr.W.D.La.1991), *aff'd*, 143 B.R. 825 (W.D.La.1992), *aff'd*, 983 F.2d 1062 (5th Cir.1993); *Arnett v. Weiner (In re Weiner)*, 95 B.R. 204, 206–07 (Bankr.D.Kan.1989).

The Ninth Circuit has followed the *Standard* line of cases, and rejected *Kraus* and those cases following it, on the question whether the Uniform Partnership Act provision enacted as NYPL § 43 creates a fiduciary relationship within the scope of Section 523(a)(4) of the Bankruptcy Code. Speaking of the California equivalent of NYPL § 43, the Ninth Circuit said in *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986):

> However, under this statute, the trust arises only when the partner derives profits without consent of the partnership; it is the sort of trust *ex maleficio* not included within the purview of § 523(a)(4). [citations omitted]

But the Ninth Circuit went on to state that "California courts, however, have raised the duties of partners beyond those required by the literal wording of [the statutory provision]" and that "California has made all partners trustees over the assets of the partnership." 780 F.2d at 796. Accordingly, the court held that California partners are fiduciaries within the meaning of Section 523(a)(4) and that Haller's debt to Ragsdale was non-dischargeable. To the same effect, *see Lewis v. Short (In re Short)*, 818 F.2d 693 (9th Cir.1987) (following *Ragsdale* applying Washington law).

A recent circuit court decision analyzing the conflicting authorities on the fiduciary question is *LSP Investment Partnership v. Bennett (Matter of Bennett)*, 989 F.2d 779 (5th Cir.1993), *reh'g denied;* 993 F.2d 1545 (5th Cir.1993), *opinion amended on reh'g,* 1993 WL 268299 (5th Cir.1993), *cert. denied,* 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993). After citing the conflicting decisions, the Fifth Circuit said: "Most courts today, however, recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law," 989 F.2d at 784–85, citing *Ragsdale, Short, Moreno v. Ashworth,* 892 F.2d 417, 421 (5th Cir.1990) (officer of a corporation owed common law fiduciary duty to corporation and stockholders sufficient to satisfy requirements of Section 523(a)(4)) and *Carey Lumber Company v. Bell,* 615 F.2d 370, 374 (5th Cir.1980) (Oklahoma lien trust statutes created an express trust). The court in *Bennett* went on to a lengthy analysis of the fiduciary duties of managing partners under Texas law and quoted from Judge Cardozo's decision in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928), a decision extensively cited in Texas and elsewhere, and concluded that under Texas law a managing partner owed a fiduciary duty to limited partners sufficient to meet the requirements of Section 523(a)(4). 989 F.2d at 790.

■ This Court concludes that under New York law the fiduciary duties owed by a managing partner to limited partners under a partnership agreement, while acting in the capacity of managing partner with respect to trust property, are sufficient to fall within the scope of Section 523(a)(4) of the Bankruptcy Code as expounded in the Supreme Court decision in *Davis v. Aetna Acceptance Company.* This conclusion does not depend on whether the Uniform Partnership Act provision embodied in NYPL § 43 gives rise to an express trust, as held in *In re Kraus* and progeny, or merely a trust *ex maleficio* as held in *In re Standard, Ragsdale* and like decisions.[2] The requirements for a determination that a debtor acted in a fiduciary capacity under Section 523(a)(4) are (1) a continuing relationship of trust existing prior to and irrespective of any particular act of wrongdoing, (2) a trust res or property with respect to which the party to be charged is accountable to others and (3) characteristically fiduciary duties over and above the obligations inherent in an ordinary, arm's length commercial relationship, whether such duties are created by contract, common law or statute. New York imposes such fiduciary duties upon a general partner acting in his capacity as a general partner at common law under the benchmark decision in *Meinhard v. Salmon* and numerous other New York cases. *Stone v. Stone (In re Stone),* 90 B.R. 71, 79–80 (Bankr.S.D.N.Y.1988), *aff'd* 94 B.R. 298, 302–03 (S.D.N.Y.1988), *aff'd* 880 F.2d 1318 (2d Cir.1989); *43 East 74th Street Associates v. Marceca (In re Marceca),* 129 B.R. 371, 373 (Bankr.S.D.N.Y.1991).

■ Before turning from the authorities on fiduciary duty, it is necessary in the context of this case to make one further point. The mere *existence* of a fiduciary relationship is not sufficient to deny dischargeability under Section 523(a)(4). The Court must also make a finding that the debtor-defendant was "*acting* in a fiduciary capacity" with respect to the particular conduct giving rise to the liability which is claimed to be nondischargeable. As observed in *In re Pedrazzini,* "The question in all of these cases is whether a trust relationship is established *in this situation.*" 644 F.2d at 758, emphasis supplied. The plaintiff-creditor must demonstrate that "the debtor acted as a fiduciary to

---

**2.** Indeed, if it were necessary for decision this Court would agree with the Ninth Circuit in *Ragsdale* and *Short* and the *Standard* line of cases that NYPL § 43 does not create a trust relationship within the scope of Section 523(a)(4). For a contrasting statute, *see Besroi Construction Corp. v. Kawczynski (Matter of Kawczynski),* 442 F.Supp. 413, 417 (W.D.N.Y.1977), where the district court concluded that New York Lien Law § 70 created an express statutory trust, existing independent of any act of wrongdoing, having a clearly defined trust res and extensive, affirmative duties in managing the trust including recordkeeping and segregating the trust funds, sufficient to constitute a fiduciary relationship under Section 17a(4) of the Bankruptcy Act.

the creditor *at the time the debt was created.*" *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir.1997), quoting from *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987), emphasis supplied. In *Davis v. Aetna Acceptance Company,* the Supreme Court concluded the text quoted above with the question "Was petitioner a trustee in that strict and narrow sense?," 293 U.S. at 333, 55 S.Ct. at 153, 79 L.Ed. at 398, and the Court went on to examine the facts. The creditor argued that the key document, a "trust receipt," specifically provided that the debtor held the property in trust "as the property of the creditor." 293 U.S. at 334, 55 S.Ct. at 154, 79 L.Ed. at 398. The Supreme Court, however, observed that the trust receipt did not stand alone "but is a member of a group [of documents] which must be read with a collective meaning." *Id.* Looking to "[t]he substance of the transaction," the Court held that the relationship of the parties was simply that of mortgagor-mortgagee, and not a fiduciary relationship. *Id.*

■ Consistent with these precepts, this Court is required to examine the totality of the relationship between Zoldan and the Partnership as well as each of the elements comprising Zoldan's judgment liability to Zohlman, in order to determine whether the liability arose from the parties' fiduciary relationship as general/limited partners or otherwise.

### *The meaning of "defalcation"*

■ While the term "defalcation" has not generated either the volume nor the disparity of analysis as that engendered by "fiduciary capacity," nevertheless the courts have expressed differing views as to the meaning of that term. Perhaps the most significant point of difference relates to the question whether defalcation includes entirely "innocent" failure of the debtor-fiduciary to account for or pay over trust property. The authorities on this issue have been examined in this Court's decision, recently published, in *In re Ellenbogen,* 218 B.R. 709 (Bankr. S.D.N.Y.1998).

Based upon the analysis set forth in *Ellenbogen,* this Court concludes that, for purposes of Section 523(a)(4), the term "defalca-

tion" requires at least some element of wrongdoing on the part of the debtor/fiduciary, and that "innocent" or merely negligent conduct, even if held actionable in a state court, is not within the scope of the statutory exception to dischargeability under the Bankruptcy Code. This conclusion is consistent with the dictionary definition and ordinary and customary usage of the term. It is a necessary conclusion to comport with the other terminology used throughout Section 523(a) under the doctrine of *ejusdem generis* and with the fundamental premise of the Bankruptcy Code that the "honest" but unfortunate debtor is entitled to a discharge and a fresh start.

### *Burden of proof*

It is well-settled that the plaintiff in an adversary proceeding seeking to hold debts non-dischargeable under Section 523(a)(4) of the Bankruptcy Code has the burden of proving by a preponderance of the credible evidence each factual element necessary to be proved to establish non-dischargeability under the subsection(s) of Section 523(a) claimed to be applicable. *Otto v. Niles (In re Niles* ), 106 F.3d at 1464 (citing *Fowler Bros. v. Young (In re Young* ), 91 F.3d 1367, 1371 (10th Cir.1996)); *Coburn Co. of Beaumont v. Nicholas (In re Nicholas* ), 956 F.2d 110, 114 (5th Cir.1992); *In re Thomas,* 729 F.2d 502, 505–06 (7th Cir.1984); *accord, J.H. Buhrmaster Co. v. Snyder (In re Snyder* ), 198 B.R. 9, 13 (Bankr.S.D.N.Y.1996) (citing *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); *Barristers Abstract Corp. v. Caulfield (In re Caulfield* ), 192 B.R. 808, 818 (Bankr.E.D.N.Y.1996); *see also Ferraro v. Phillips (In re Phillips* ), 185 B.R. 121, 129 (Bankr.E.D.N.Y.1995) (citing *Grogan* ).

■ Accordingly, the burden rested upon Zohlman to prove by competent evidence that Zoldan was acting in a fiduciary capacity in respect of the items for which he was surcharged and that those items constituted defalcations within the meaning of the Federal statute.

### *Findings and Conclusions*

In order to resolve this adversary proceeding, two determinations must be made under

the statute. First, was Zoldan "acting in a fiduciary capacity" within the meaning of Section 523(a)(4)? Second, did the sums for which Zoldan was surcharged constitute "defalcations" within the meaning of Section 523(a)(4)? Since the several items of surcharge differed in significant respects, these questions must be answered with respect to each item.

The following table, drawn from the Referee's Report, sets forth the categories of items in dispute, the amounts claimed by Zohlman and the amounts awarded by the Referee.

| Item | Description | Claimed by Zohlman | Awarded by Referee |
|---|---|---|---|
| A. | Management fees (those in excess of 4%) | $ 8,537 | $ 8,537 |
| B. | Mortgage fee | 15,000 | 15,000 |
| C. | Commission on sale of building | 75,000 | 75,000 |
| D. | Construction | 92,897 | 92,897 |
| E. | Lease Commissions | 32,498 | — |
| F. | Outside labor | 136,603 | 104,399 |
| G. | Salaries | 17,055 | 17,055 · |
| H. | Payroll taxes | 2,434 | — |
| I. | Building cleaning and maintenance | 12,952 | 10,452 |
| J. | Maintenance fees | 27,188 | 27,188 |
| K. | Professional fees | 9,448 | 7,948 |
| L. | Miscellaneous | 5,556 | 5,556 |
| M | Repairs | 29,946 | 29,946 |
| N. | Sundry | 6,069 | 6,049 |
| O. | Improvements | 31,583 | 21,158 |
| | Total not agreed | $502,766 [3] | |
| | Total claims allowed | | $421,185 [4] |

The evidence at the trial consisted of one live witness, defendant Zoldan, called by plaintiff Zohlman, the Partnership Certificate and Partnership Agreement (Exhibit 1), the Referee's Report (Exhibit 2), transcripts of the hearings before the Referee (Exhibits 3A, 3B and 3C), the Judgment signed by Justice Wood and filed October 13, 1992 (Exhibit 4) and a "Decision" of Justice Wood signed May 29 and filed June 1, 1992 (Exhibit 5). The findings and conclusions set forth herein are based upon Zoldan's testimony, which this Court found to be entirely credible, and Exhibits 1 through 5, inclusive, which this Court has examined carefully, including the transcripts of the hearings before the Referee.

***Whether Zoldan acted in a fiduciary capacity***

With the exception of items B and C, it is this Court's conclusion that Zoldan was not acting in a fiduciary capacity with respect to any of the items for which he was surcharged in the Referee's Report. This conclusion is based upon the provisions of the Partnership Agreement and the actual conduct of the parties in their relationships, which were descriptive of an ordinary commercial relationship and not the sort of fiduciary relationship found in *Meinhard v. Salmon, In re Stone, In re Marceca* and the other common law decisions on which Zohlman relies for the imposition of fiduciary duties upon a general partner. The following provisions of the Partnership Agreement illustrate the point:

- Paragraph B.6. of Article THIRTEENTH authorized the General Partner to engage in self-dealing by hiring "himself or any affiliate of his" as Managing Agent for the Project, confirmed by the definition of Managing Agent at page 3 ("whether or not affiliated with the General Partner").

- Paragraph C. of Article THIRTEENTH authorized the General Partner to act in conflict with the Partnership, stating

---

3. The Referee's tally of this column of $503,216 appears to have been in error.

4. The Referee's tally of this column of $421,205 appears to have been in error.

"Each Partner shall be free ... to engage in any business whatever ... which compete[s] ... with the Project."

- Article SIXTEENTH provided in paragraph D. that the General Partner was entitled to receive a fee of $35,000 from the seller from which the Partnership purchased the Office Building.
- Article EIGHTH paragraph A., providing for a firm of certified public accountants to audit the books of the Partnership annually, authorized the General Partner to employ his own accountants for this purpose.
- Article EIGHTEENTH paragraph A. provided that the General Partner would not be subject to liability for any act or failure to act "[e]xcept in case of gross negligence or willful misconduct," and paragraph B. required the Partnership to indemnify and hold harmless the General Partner unless he was guilty of gross negligence or willful misconduct.
- Article TWENTY–SECOND paragraph F. provided that the Partnership Agreement should be construed in accordance with New York law "provided, however, that to the extent permitted by said laws, the provisions of this Agreement shall govern the relations among the Partners."

These provisions of the Partnership Agreement, permitting the General Partner to engage in self-dealing and conflict of interest, allowing the General Partner to receive a fee from the Partnership's counterparty and to employ his own accountants to act for the Partnership, and exonerating the General Partner and providing him with indemnification for any conduct short of "gross negligence or willful misconduct" are entirely inconsistent with the concept of fiduciary relationship. They demonstrate that the parties viewed Zoldan's relationship to the Partnership and the limited partners as an ordinary commercial relationship in which Zoldan would act as the Managing Agent of the Office Building. That is what the Partnership Agreement provided, and that is what the parties did. Zoldan retained himself to act as Managing Agent of the Office Building, and Zohlman and the other limited

partners were at all times aware of this fact and they never objected. There is nothing in the record to suggest that the Partnership books and records were not maintained in the ordinary course of business, audited annually by certified public accountants and available at all times to Zohlman and the other limited partners to examine and audit themselves if they so chose.

Other than items B and C, all of the contested items as to which the Referee made an award concern expenditures typical of those which would be incurred by a typical managing agent of any office building. Although the Referee disallowed Zoldan's expenditures in part for these items and, accordingly, surcharged Zoldan, there is no suggestion in the record before me that any of the items in question (items D, F, G, I, J, K, L, M, N and O) related to anything other than the reconstruction, operation and maintenance of the Office Building.

Accordingly, I hold that Zoldan was not "acting in a fiduciary capacity" with respect to any of the items for which he was surcharged by the Referee other than items B and C.

### Whether any of the questioned items constituted defalcation

 Assuming, *arguendo*, that Zoldan could be deemed to have been acting in a fiduciary capacity with regard to items A and D–O, I would nevertheless conclude that Zohlman has failed to sustain his burden of proving that any of these items constituted a defalcation within the meaning of Section 523(a)(4) of the Bankruptcy Code. Nothing in the Referee's Report disallowing these items in whole or in part suggests that Zoldan acted other than in good faith with respect to any of these items, although the Referee disagreed with his position in certain respects.

As to item A, even if Zoldan were deemed to have acted in a fiduciary capacity in paying himself management fees, the question remains whether Zohlman has sustained his burden of proof that the overpayment of management fees by $8,537 over a six-year period constituted defalcation within the meaning of Section 523(a)(4). I conclude

that it did not. The $8,537 figure represents a trivial fraction of the 4% management fees payable under the Partnership Agreement. The Referee concluded that this figure "would appear to [be] a calculation error." There is no suggestion anywhere in the record or in argument by Zohlman's counsel that the overpayment was in the slightest degree venal or that it resulted from any cause other than mere negligence. Under the analysis set forth in *In re Ellenbogen*, I conclude that item A did not constitute defalcation within the meaning of Section 523(a)(4).

The Referee's finding with regard to item D gives no clue as to the nature of the dispute or the reason for the Referee's disallowance of the item, other than his conclusion that "I find it unreasonable and unproven." Items F and G, concerning outside labor and salaries, were disallowed in part, it would appear, by the Referee's interpretation of a provision of the Partnership Agreement relating to maintenance of books and records which led the Referee somehow to conclude that the charging of a flat percentage was inappropriate. The Referee's rulings with respect to items I, K, L, M and N provide no guidance as to the rationale for disallowance (or rather, partial disallowance in each case), other than the fact that the Referee disagreed with or was not satisfied by the accounting which was provided by Zoldan's accounting staff for the expenditures to third parties which were indisputably made. The partial disallowance in item J appears to be based upon testimony given in October 1991, long after the fact, by one of Zoldan's employees in which he said "I think if I had it to do over again, I would have Alex retain the services of some part-time office temp service to schedule out every disbursement and tie it all out...." With regard to item O, concerning a 1983 expenditure which was capitalized as a journal entry to debit renovation costs, the Referee simply stated "I feel that a journal entry required some information and the back-up should be available." Zoldan testified credibly in this Court, and no evidence was brought to this Court's attention to the contrary, that all of the expenditures disallowed by the Referee were clearly and properly recorded and disclosed in the Partnership's books and records and evidenced by checks or other disbursement records of payments to third parties. Disallowance of most items was based on the fact that by 1992 the Partnership no longer retained third-party invoices or underlying documents justifying allocations of Zoldan's costs between the Office Building and other properties managed by Zoldan.

The purpose of this analysis is not to second-guess the Referee's conclusions as to Zoldan's liability, which are res judicata and binding on Zoldan in this Court. The point is that there is nothing in the Referee's Report to support any findings of fact by this Court necessary to conclude that any of the contested items could be characterized as defalcations under Section 523(a)(4) of the Bankruptcy Code. The Referee did not find that Zoldan diverted or misappropriated Partnership property for himself. He did not base his conclusions on any findings of fraud or deceit or failure to "account" in the sense of failure to document where the money went. He did not make any finding of willful misconduct or conscious wrongdoing by Zoldan. To the extent that the Referee disallowed items in part, his conclusions appear to have been based upon his interpretation of the Partnership Agreement, his unelaborated view as to what was and was not "reasonable," an answer given by one of Zoldan's employees years after the event that he would have done things differently if he had it to do over again, and the failure to retain invoices for payments to third parties which were otherwise fully recorded in the Partnership's books and records. Under the analysis set forth in *In re Ellenbogen*, in the absence of any factual basis for a finding of breach of fiduciary duty or some other element of willful misconduct or intentional wrongdoing on the part of Zoldan, this Court is not in a position to conclude that any of the items in question constituted a defalcation within the meaning of Section 523(a)(4).

The facts giving rise to item B, the $15,000 mortgage fee, were as follows (*see* Pl.Ex. 3B, Transcript of May 15, 1991 [hereinafter "Tr."] 128–144). In early 1986 it became necessary to obtain refinancing for the Office Building because the third mortgage was

coming due and it would have had to have been paid by the limited partners if not refinanced. Zoldan and his employees did substantial work in obtaining the refinancing. A closing on the refinancing was held on May 22, 1986. A closing statement was prepared by counsel which reflected the $15,000 mortgage fee payable to Zoldan (Tr. 134). Copies of the closing statement were forwarded to the limited partners (Tr. 133). Zohlman authorized release of the refinancing proceeds, including the mortgage fee to Zoldan (Tr. 139), and neither Zohlman nor any other limited partners ever objected to the mortgage fee prior to commencement of the accounting proceeding (Tr. 143–144).

Zohlman's counsel did not offer any evidence bearing upon item B nor did he draw to this Court's attention any evidence in the record before the Referee. The Referee's Report contains the following statement regarding item B, quoted in its entirety: "This is not provided as an agreed expense by the partnership agreement and is disallowed." Once again, there is no finding by the Referee nor even argument by Zohlman that the payment of this fee was a breach of fiduciary duty, or fraudulent or deceitful in any way, or that the fee was not fully disclosed to the limited partners in advance, or that the limited partners made any objection to payment of the fee prior to the accounting proceeding, or that Zoldan did not render the service to the Partnership for which he took the fee. Having heard the credible testimony of Zoldan, and no evidence suggesting to the contrary, I am persuaded that Zoldan took the mortgage fee in the good faith belief that he was entitled to the fee for services rendered to the Partnership. The Referee's determination that Zoldan was not entitled to the fee as a matter of contract is res judicata on the issue of Zoldan's liability. But the Referee's Report and state court judgment is neither res judicata nor collateral estoppel on the question of dischargeability, which must be determined by this Court. Lacking any factual basis in the record before me for a finding that the mortgage fee constituted a defalcation within the meaning of Section 523(a)(4) of the Bankruptcy Code, I conclude that Zohlman has not sustained his burden of proof with respect to item B.

■ Item C is on a different footing. In early 1987 Zoldan arranged for the sale of the Office Building, without using the services of any outside broker or incurring an outside broker's commission. Having negotiated the transaction on behalf of the Partnership, Zoldan proposed that he should be paid a 5% commission in lieu of a broker's commission, and his letter or memorandum to Zohlman and the other limited partners seeking their approval of the transaction disclosed the proposed payment of $75,000 of the sale proceeds to himself. Zohlman and the other limited partners approved the sale of the Building, but Zohlman strenuously objected to the payment of any commission to Zoldan and wrote a letter to Zoldan dated March 31, 1987 stating that no such commission should be paid to Zoldan out of Partnership assets. The transaction closed and, notwithstanding Zohlman's letter of March 31, 1987, Zoldan paid himself $75,000 out of the proceeds.

It cannot be said that Zoldan was acting as Managing Agent of the Office Building in connection with the sale of the Building, since this would not be within the normal scope of a managing agent's duties. Thus, he was acting as Managing Partner and, therefore, in a fiduciary capacity under New York law in connection with the sale.

Under these circumstances, it is difficult to distinguish Zohlman's claim with respect to item C from the facts presented to the Second Circuit in *In re Herbst*. Like the fiduciary in *Herbst*, Zoldan was on notice that the trust beneficiaries challenged his right to an emolument to be paid from trust assets. Of course, Herbst's right to the commission was the subject of a pending legal challenge, and Herbst's right to the commission had been adjudicated in his favor in the lower court. But neither of these differences is a material distinction. In both cases, the fiduciary was on notice that the trust beneficiaries challenged his entitlement to trust property and, notwithstanding the challenge, the fiduciary paid himself the contested commission, subjected the contested fund to the risk of his own business affairs and could not pay the judgment after the dispute was adjudi-

cated. Under the authority of *In re Herbst,* Zoldan's payment to himself of the $75,000 mortgage commission, knowing of Zohlman's objection and before his right to the commission had been determined, constituted a defalcation within the meaning of Section 523(a)(4). Accordingly, Zohlman is entitled to an order denying dischargeability as to item C.

\* \* \*

Counsel for the parties are directed to promptly agree upon a form of order consistent with this decision, without prejudice to the right of either party to appeal.