In re Mark Allan KOVLER and Elyse Hope Kovler, Debtors.

Bettijaine Gentry and Gentry Promotions, Inc., Plaintiffs,

v.

Mark Allan Kovler and Elyse Hope Kovler, Defendants.

Bankruptcy No. 98 B 20635(ASH).
Adversary No. 98–5227A.

United States Bankruptcy Court, S.D. New York.

Jan. 14, 2000.

Curtis & Riess–Curtis, P.C., By Cheryl Riess–Curtis, New York City, for Plaintiffs.

Certilman Balin Adler & Hyman, LLP, By Jaspreet S. Mayall, Harold Somer, Ronald S. Kaniuk, East Meadow, NY, for Defendants–Debtors.

### DECISION AFTER TRIAL

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

In an adversary proceeding against the debtors-defendants Mark and Elyse Kovler ("Mark," "Elyse" or "the Kovlers") turning principally on the credibility of the Kovlers, plaintiffs Bettijaine Gentry and Gentry Promotions, Inc. ("Gentry" or "plaintiffs") seek (1) a judgment for damages consisting of legal fees under New York Debtor and Creditor Law ("D & CL") § 276–a (the "Fraudulent Conveyance Claim"), (2) a judgment for $1,000, trebled, against Mark in respect of money allegedly held in escrow by Mark for plaintiffs' assignor, Linda Lurie (the "Lurie Claim") and (3) a determination that such judgments are non-dischargeable under 11 U.S.C. §§ 523(a)(2), (4) and (6).

With respect to the Fraudulent Conveyance Claim, Gentry alleges, in substance, that in 1994 Mark, faced with a legal malpractice claim against him by Gentry for which he had no malpractice insurance, fraudulently conveyed his joint interest in the matrimonial home to his wife, Elyse, in

violation of D & CL § 276, and that Elyse's reconveyance of his joint interest to Mark in 1997 was simply an attempt, by capitulating on the claim under D & CL § 276, to avoid liability on plaintiffs' claim for attorneys' fees under D & CL § 276–a. The Kovlers defend by asserting that the April 1994 deed conveying Mark's joint interest to Elyse was a *bona fide* transaction implementing a *bona fide* separation agreement executed by the parties in February 1994 (the "Separation Agreement"), and that the April 1994 conveyance was not for the purpose of defrauding creditors.

In the Lurie Claim plaintiffs assert that Mark held $1,000 of Linda Lurie's funds in escrow in connection with the closing of the sale of her family home in June 1990 because of a possible dispute with the purchaser. The escrow funds were to have been released upon resolution of the dispute, but Mark never returned the funds. Mark's position, as asserted in the Joint Pretrial Order, is that "[a]ll funds that Mr. Kovler held in connection with the Lurie house closing transaction were properly turned over by Mr. Kovler to the appropriate parties."

After a hearing in December 1998, this Court entered an order dated January 19, 1999 granting summary judgment on the issue of dischargeability (without reaching the merits) in favor of the Kovlers on all of plaintiffs' state law claims except the Lurie Claim and the Fraudulent Conveyance Claim, thereby mooting the merits of those claims held to be dischargeable. The Lurie Claim and the Fraudulent Conveyance Claim were tried to the Court sitting without a jury both on the merits and as to dischargeability during the week of November 8–12, 1999. The record was held open to receive certain additional documentary evidence from plaintiffs. By letter dated November 17, 1999 plaintiffs' counsel submitted to the Court and offered in evidence two sets of excerpts from depositions of Mark (the "November 17 Exhibit"). There being no objection by the Kovlers, the November 17 Exhibit is received in evidence.

### Jurisdiction

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference dated July 10, 1984 (Ward, Acting Chief Judge). This is a core proceeding under 28 U.S.C. § 157(b).

### Findings of Fact, Conclusions of Law

The following constitute the Court's findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### I. Factual Background

Mark and Elyse are both licensed attorneys and experienced in the general practice of law. Mark and his law office provided legal services to plaintiffs and plaintiffs' assignor, Linda Lurie. Commencing in 1988, Gentry retained Mark for a variety of legal assignments, including personal and corporate income tax services and representation of Bettijaine Gentry in a personal injury lawsuit. By 1992 the relationship between Mark and Gentry had completely broken down. Bettijaine Gentry retained another lawyer who, commencing in the fall of 1992 and on into 1993, wrote of a series of letters to Mark demanding files relating to Gentry and threatening litigation. Mark did not respond to the letters and did not turn over any files. In February 1993 Bettijaine Gentry filed a complaint with the Disciplinary Committee of the Second Judicial Department alleging a variety of wrongdoing on the part of Mark.

On May 11, 1994 Gentry filed a complaint against Mark in the United States District Court for the Southern District of New York (the "District Court Action") alleging a variety of wrongdoing including malpractice and seeking some $2 million in damages. The District Court Action was litigated intensively by the parties in dis-

covery proceedings and otherwise until stayed by the Kovlers' bankruptcy filings in this Court.

The property which was the subject of the plaintiffs' Fraudulent Conveyance Claim is real estate located 2 (or 6) Ryder Road, Briarcliff Manor, Town of New Castle (the "Ryder Road Property" or "Property"). The Ryder Road Property served both as the Kovlers' marital residence and as Mark's law office during all times relevant to this dispute. The Property was originally held jointly by Mark and Elyse. Mark's joint interest in the Property was transferred to Elyse in 1994 (the "1994 Transfer") by deed dated April 14, 1994 (the "1994 Deed"). Although there is a dispute as to the date the 1994 Deed was actually prepared and signed, there is no dispute that the 1994 Deed was filed in the Westchester County Clerk's Office on December 20, 1994.

After discovery of the 1994 Transfer, Gentry's complaint in the District Court Action was amended on June 26, 1996 to join Elyse as a defendant and to assert a fraudulent conveyance claim against both Kovlers under D & CL §§ 276 and 276–a.

By deed dated July 30, 1997 (the "1997 Deed") Elyse reconveyed to Mark his joint interest in the Ryder Road Property. The 1997 Deed was filed on July 31, 1997.

On the same day, July 31, 1997, the Kovlers filed a petition under Chapter 13 in this Court. The Chapter 13 case was ultimately dismissed. In 1998 the Kovlers filed the instant case under Chapter 7. This adversary proceeding was timely commenced on July 31, 1998.

## II. *Fraudulent Conveyance under D & CL §§ 276 and 276–a*

Sections 276 and 276–a of the D & CL provide as follows (McKinney's Consolidated Laws of New York (1990)):

### § 276. Conveyances made with intent to defraud

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

### § 276–a. Attorneys' fees in action or special proceeding to set aside a conveyance made with intent to defraud

In an action ... brought by a creditor ... to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action ... the creditor ... shall recover judgment, the justice ... presiding at the trial shall fix the reasonable attorney's fees of the creditor ... in such action ..., and the creditor ... shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment....

"To prevail in an action under Section 276, the plaintiff must establish that (1) the thing disposed of must be of value, out of which the creditor could have realized a portion of his claim; (2) it must be transferred or disposed of by the debtor; and (3) it must be done with intent to defraud." *In re Montclair Homes, Inc.,* 200 B.R. 84, 96 (Bankr.E.D.N.Y.1996), citing *Hoyt v. Godfrey,* 88 N.Y. 669 (N.Y. 1882). To declare a conveyance fraudulent, actual intent to defraud is necessary. *Spear v. Spear,* 101 Misc.2d 341, 421 N.Y.S.2d 277 (N.Y.Cty.1974). Mutual fraudulent intention on the part of both parties to the transaction is required in order to invoke the protection of the law prohibiting fraudulent conveyances; fraudulent intent on the part of one of the parties is insufficient. "The transferee must have participated or acquiesced in the transferor's fraudulent act." *Anderson v. Blood,* 152 N.Y. 285, 46 N.E. 493, *reh'g denied,* 153 N.Y. 649, 47 N.E.

1105 (N.Y.1897); *Key Bank of New York v. Diamond*, 203 A.D.2d 896, 897, 611 N.Y.S.2d 382, 384 (4th Dep't 1994). Actual intent to hinder, delay or defraud creditors must be proved. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991) (recovery or attorneys' fees under Section 276–a requires "explicit finding of actual intent to defraud" by both the transferor and the transferee), citing *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17, 20–21 (2d Dep't 1986). Actual intent to defraud is a prerequisite for an award of attorneys' fees under Section 276–a. *Domino Media, Inc. v. Kranis*, 9 F.Supp.2d 374 (S.D.N.Y.1998), *aff'd* 173 F.3d 843 (2d Cir.1999).

■ Numerous courts have held that "actual intent may be proven by circumstantial evidence." *See, e.g., Key Bank of New York*, 203 A.D.2d at 897, 611 N.Y.S.2d at 384. *See also, Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir. 1983); *Dixie Yarns, Inc. v. Forman*, 906 F.Supp. 929 (S.D.N.Y.1995); *Continental Bank, N.A. v. Modansky*, 159 B.R. 129 (S.D.N.Y.1993), *aff'd* 41 F.3d 1501 (2d Cir. 1994); *In re The Bennett Funding Group, Inc.*, 220 B.R. 743, 755–56 (Bankr. N.D.N.Y.1997); *Pen Pak Corp. v. LaSalle National Bank of Chicago*, 240 A.D.2d 384, 386, 658 N.Y.S.2d 407, 408 (2d Dep't 1997); *Prudential Savings Bank v. Grant*, 99 N.Y.S.2d 602 (N.Y.Cty.1950). The actual intent must be based on fact and cannot rest on mere suspicion. *First National Bank v. Frank*, 1 A.D.2d 539, 151 N.Y.S.2d 596 (4th Dep't 1956), *aff'd* 3 N.Y.2d 849, 166 N.Y.S.2d 84, 144 N.E.2d 727 (N.Y. 1957).

■ The burden of proof to establish actual fraud rests upon the plaintiffs. *Marine Midland Bank v. Murkoff, supra; Key Bank of New York v. Diamond, su-*

pra. Under New York law, the standard of proof for establishing actual fraud is said to be clear and convincing evidence. *Marine Midland Bank v. Murkoff, supra; In re Montclair Homes*, 200 B.R. at 96; *First National Bank v. Frank, supra; Cooper v. Maurer*, 37 N.Y.S.2d 992 (N.Y.Cty.1942).

To summarize, there is no real dispute between the parties as to the governing law or the applicable legal standards for determining plaintiffs' Fraudulent Conveyance Claim. To obtain a judgment against both of the Kovlers for fraudulent conveyance under Section 276 and legal fees under Section 276–a, plaintiffs have the burden of establishing the following elements:

(1) that Mark transferred property to Elyse;

(2) that the property transferred had value out of which plaintiffs could have realized a portion of their claim for damages in the District Court Action; and

(3) that both Mark and Elyse had an actual intent to "hinder, delay or defraud either present or future creditors." [1]

■ Recognizing that "[d]irect evidence of fraudulent intent is often elusive," *Pen Pak Corp. v. LaSalle National Bank of Chicago*, 240 A.D.2d at 386, 658 N.Y.S.2d at 408, and that "actual intent" may be gleaned from the circumstances surrounding the transaction, *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 315, 318 (Bankr. S.D.N.Y.1999), the courts have looked to certain "badges of fraud" as circumstantial evidence of actual intent to defraud by means of a conveyance of property, including the following:

(a) the close relationship among the parties to the transaction;

(b) the adequacy of the consideration;

---

[1]. In points I, II and III of their Trial Brief, the Kovlers address the elements of a claim for constructive fraudulent conveyance under Section 548 of the Bankruptcy Code and Sections 272, 273, 273–a and 274 of the D & CL, all of which involve conveyances for less than

adequate consideration by a debtor which is insolvent or would be rendered insolvent by the conveyance, but lacking the element of actual fraud. These Sections are not relevant because the Gentry claim is based upon actual intent to defraud, not constructive fraud.

(c) the transferor's (and transferee's) knowledge of the creditor's claims or claims likely to be asserted, and the transferor's inability to pay them.

(d) the retention of control and economic and other benefits of the property by the transferor after the conveyance.

(e) the transferor's (and transferee's) financial condition before and after the transfer.

*Id.; Bennett Funding*, 220 B.R. at 755–56; *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir.1983); *Le Café Creme, Ltd. v. Xavier Le Roux, et al. (In re Le Café Creme, Ltd.)*, 244 B.R. 221, 242–43 (Bankr.S.D.N.Y.2000).

■ If actual intent to defraud is established, Section 276–a expressly mandates that the Court "shall fix the reasonable attorney's fees of the creditor [and that] the creditor shall have judgment therefor against the debtor and the transferee." *See Polkowski v. Mela*, 143 A.D.2d 260, 262, 532 N.Y.S.2d 159, 159 (2d Dep't 1988); *Dixie Yarns, Inc. v. Forman, supra; In re Hickey*, 168 B.R. 840, 845 (Bankr. W.D.N.Y.1994); *Continental Bank v. Modansky*, 159 B.R. at 135.

## III. Findings and Conclusions on the Fraudulent Conveyance Claim: Plaintiffs' Burden

With regard to element (1), referred to above, there is no dispute that Mark conveyed his interest in the Ryder Road Property to Elyse by means of the 1994 Deed.

With regard to element (2), neither side proffered an appraisal of the Ryder Road Property. However, there is no dispute that the Property had value over and above any liens. The Kovlers purchased the Property in 1988 for $317,000, paying $117,000 in cash and giving a $200,000 mortgage. They took a second mortgage in 1992 for $49,000 to make repairs to the house. Absent depreciation in the value of the Property (of which there was no competent or credible evidence), these figures would posit equity of at least $68,000 even assuming that no value was added by the repairs in 1992. Mark testified that his joint interest in the Property was conveyed to Elyse in exchange for various liquid assets valued at $40,000 to $44,000 (November 17 Exhibit, Tr. May 1, 1997 at 285, 288–89, Tr. June 29, 1998 at 72).[2] I find as a fact that plaintiffs have sustained their burden of proof on element (2): the Ryder Road Property had value out of which the plaintiffs could have recovered a portion of the damages sought in the District Court Action.

The principal issue at the trial related to element (3), namely, whether either or both Mark or Elyse engaged in the 1994 Transfer with the actual intent "to hinder, delay or defraud either present or future creditors."

■ As recognized by the courts, actual fraud nearly always must be established inferentially by circumstantial evidence. Applying the "badges of fraud" analysis prescribed in the case law, the objective evidence in this case gives rise to a clear and convincing inference of fraudulent intent on the part of the Kovlers within the scope of Section 276.

(a) *Relationship of the parties.* In this case the transfer was not at arm's length between unrelated parties. Here the husband transferred to his wife his joint interest in real estate constituting their marital home and the husband's office.

(b) *Adequacy of consideration.* Mark testified at trial that, in the context of dividing the marital property pursuant to the Separation Agreement, he conveyed his joint interest in the Ryder Road Property to Elyse in exchange for a savings account and various securities or securities

---

**2.** Mark testified that he liquidated any such assets and spent the proceeds before filing for bankruptcy in 1997.

accounts valued at $40,000 or more. Elyse testified that she did not know what the marital assets consisted of and that all the assets and finances of the Kovlers were controlled exclusively by Mark. The Kovlers did not offer any documentary or other evidence concerning the assets purportedly transferred to Mark in exchange for his interest in the Ryder Road Property, or who owned the assets, nor did Mark account for the disposition of any such assets other than to avow that the assets had been liquidated and the proceeds spent. In short, from the perspective of creditors and fraudulent conveyance analysis, there was no proof of any real consideration for the 1994 Transfer. Mark conveyed his real estate to his wife, out of reach of his creditors, and he received, if anything, liquid assets over which he already had control, if not ownership, which he then liquidated and spent.

(c) *The Kovlers' knowledge of Gentry's claims.* Whether the transfer of the Ryder Road Property was effected on April 14, 1994, the date of the 1994 Deed, or in December when the Deed was recorded in the Westchester County Clerk's Office, there is no doubt that the Kovlers either knew of Gentry's District Court Action (served in June 1994) or knew of the imminence of such a suit, and the fact that Mark had no professional liability in-

surance to cover it. Gentry had retained other counsel who wrote repeated letters to Mark commencing in the fall of 1992, and Gentry filed a complaint with the Disciplinary Committee against Mark in February 1993 which made clear Gentry's intent to sue. Moreover, Elyse testified unequivocally in her December 1997 deposition that the reason for the 1994 Transfer was concern for the *Gentry* lawsuit which either had been commenced or was anticipated (Elyse's testimony on this point was equivocal) and for which Mark had no malpractice insurance, coupled with the fact that Elyse was not herself practicing law (and therefore could not be a defendant in the malpractice action).[3]

(d) *Retention of use and control by Mark.* Although the Kovlers testified that there was a separation and that Mark moved out of the Ryder Road Property and went to live at his grandparents' home in Long Island from February until sometime in May 1994, it is clear from the Kovlers' own testimony that Mark's use and enjoyment of the marital home and his office was not affected in the slightest degree by the 1994 Transfer, whether it occurred in April or December 1994. Even during the purported marital separation from February to May, Mark had uninhibited access to the Ryder

---

**3.** Elyse's December 1997 deposition testimony appears at Trial Transcript 464–65 as follows:

Q Did your relationship deteriorate in any way when you learned that Mr. Kovler had been sued?
A Yes.
Q In what way did it deteriorate?
A I was upset and angry and scared.

＊　＊　＊　＊　＊　＊

Q Was there any property transferred?
A About this time the house was in both of our names and it was transferred to me.
Q Why was that done?
A Well, for a few reasons. One is I was so ignorant with what he had and what, you know, monies and accounts—because I never did any. I had no hands-on knowledge. So I thought at least if I had something—the house—I would have something.

Q Why else was the property transferred to you at this time?
A Because I was seared that if he got sued, even though the *Gentry* case did not start, he didn't have malpractice insurance and I wasn't practicing law. So it was a combination.

＊　＊　＊　＊　＊　＊

Q What were the other reasons that the marital home was transferred to your name alone?
A Well. I thought if he were to get sued and because he didn't have malpractice insurance, that it may be smart for it to be in my name also. And as I said to you, I was not practicing law.

*Cf.,* Elyse's conflicting testimony at trial as to the reason for the 1994 Transfer (Trial Tr. 463 *et seq.*).

Road Property to visit the Kovlers' minor children and utilize his law office, and it appears that he did visit the Property frequently and at will. The purported separation ended sometime in May 1994; within a few days of the April 14 date of the 1994 Deed. And, of course, the separation had ended seven months before the 1994 Deed was recorded in the County Clerk's Office on December 20, 1994.

**(e)** *The Kovlers' financial condition before and after the transfer.* Whether or not one believes Mark's testimony that financial assets were transferred to him in consideration of the 1994 Transfer to Elyse of the Ryder Road Property, it is clear that there was only one material change in the Kovlers' financial circumstances and domestic lives as a consequence of the 1994 Transfer— Mark's joint interest in the Ryder Road Property was placed beyond the reach of his creditors. Nothing else changed. At all times before, during and after the alleged separation and Transfer, Mark had unfettered access to and use of the Ryder Road Property both for home and office. At all times Mark alone was responsible for all costs and financial aspects of the Ryder Road Property. And at all times both before and after the 1994 Transfer Mark alone had exclusive knowledge of and control over all of the Kovlers' financial assets.

All of these findings of fact are based on the Kovlers' own testimony. Under the case law, these "badges of fraud" compel a finding of actual intent "to hinder, delay or defraud present or future creditors" in the absence of some innocent explanation for the 1994 Transfer, and I so find.

## IV. *The Bona Fide Purpose Defense: Defendants' Burden*

 Once plaintiffs have established a prima facie case of actual intent to defraud, the burden shifts to defendants to offer by affirmative defense an innocent explanation for their conduct. *See United States v. Orozco–Prada,* 636 F.Supp. 1537, 1541 (S.D.N.Y.1986) ("Proof of actual fraudulent intent makes a *prima facie* case and shifts to the grantee the burden of establishing his good faith in the transfer."). To rebut the inference of actual intent to defraud arising from the above facts and testimony, the Kovlers offered a factual explanation for the 1994 Transfer designed to show that the Ryder Road Property was actually conveyed in April 1994, prior to the May 1994 commencement of the District Court Action, in order to implement a property settlement between Mark and Elyse pursuant to a Separation Agreement purportedly signed by them on February 3, 1994. It is this defense which gives rise to the issue of the Kovlers' credibility which is determinative of the Fraudulent Conveyance Claim.

The Kovlers' defense turns upon the *bona fides* of two critical documents—the February 3, 1994 Separation Agreement and the April 14, 1994 Deed. The credible evidence does not support the *bona fides* of either document.

### A. *The Alleged Separation and Separation Agreement*

The Separation Agreement bears little resemblance to such documents prepared by experienced matrimonial counsel. The Kovlers' Separation Agreement and their testimony relating to it and to their supposed separation expose lacunae, anomalies and irreconcilable contradictions so stark as to undermine the capacity of even the most credulous to accept the document as a *bona fide* separation agreement. In this regard, the Court makes the following findings and summary of evidence, numbered for reference but not in order of importance.

(1) At no time did the Kovlers ever consult a matrimonial attorney or any lawyer in respect of their alleged marital discord. The Separation Agreement was drafted solely by Mark. With respect to their purported separation from sometime in early February until sometime in May, there was no evidence of any kind,

either testimonial or documentary, that the parties did in fact separate, other than the testimony of Mark and Elyse. As far as the outside world was concerned, nothing changed (Trial Tr. 351). Mark testified that the separation was from February to sometime in May. Elyse testified it was "a few weeks" (Trial Tr. 439). Mark's grandparents, at whose home on Long Island he said he resided during the separation, both died and were unavailable to testify. Elyse testified in a deposition that she had no specific memory of Mark moving in with his grandparents (Trial Tr. 440). Elyse's brother, Jonathan Diller, whose signature appears as a witness on the 1994 Deed and with whom Elyse apparently had a close relationship, was afflicted with AIDS and died in October 1995. Mark avowed in testimony that there was no other family member or person who had knowledge of and could testify concerning the Kovlers' separation. The Court has already made findings concerning Mark's unfettered access to and use of his home and office at the Ryder Road Property during the separation (*see, e.g.,* Elyse's testimony at Trial Tr. 544). During the separation Mark did not remove his clothing or any other personal property from the Ryder Road Property, except toilet articles and a change of clothing. Mark testified that he did not remove any property or files from his home office, except a laptop computer and whatever file or files he needed to work on. The principal, if not the only, legal matter on which Mark worked during the separation was a commercial case which went to trial for a number of weeks ending in late April or early May 1994. The trial was held in Nassau County, which might explain why Mark resided temporarily at his grandparents'

home in Long Island, if he did reside there. Mark ended his separation and returned to the marital home at or about the conclusion of the trial in Nassau County.

(2) The Separation Agreement itself is a typewritten document of six numbered pages produced by a word processor with justified left— and right-hand margins. It begins on page 1 "THIS AGREEMENT is made this day of between" Mark and Elyse. It consists of five unnumbered preliminary recital paragraphs and twenty-four numbered paragraphs. After paragraph 24 at the left margin appears "Dated: , 1994", followed by a signature line over the name MARK A. KOVLER to the right, followed by the legend at the left margin "Sworn to before me this day of , 1994", followed by a signature line over the name ELYSE H. KOVLER, followed by a legend at the left margin "Sworn to before me this day of , 1994." All the blank dates on the first and sixth pages, including those in the notarial blocks, are filled 03 February 1994 or February 3, as the case may be, in handwriting which Mark acknowledged at trial to be his handwriting.

(3) Paragraph 1 states "The parties may and shall at all times live separate and apart." While such a paragraph obviously would not bind the parties to live separate and apart, the Court has already made findings with respect to Mark's unfettered continued access to and use of the Ryder Road Property throughout the separation. The Court has also found the absence of any evidence, save for the uncorroborated testimony of Mark and Elyse, that the parties actually did separate, or intend to separate at any time.

(4) Paragraph 4 states "That the parties have transferred and conveyed, as

mutually agreed upon, the items of furniture and fixtures, cooking and cleaning utensils, and sundry items of personalty that are deemed marital property." This paragraph is not factual. The Court has already made findings concerning the fact that Mark never removed any personal or professional property from his home or office other than that necessary for transitory use.

(5) Paragraph 3 deals with the crucial subject of the parties' division of their marital assets.[4] The Court has already made findings with respect to the testimony of Elyse that she had no control over or knowledge of any of the marital assets or affairs (*see, e.g.,* Elyse's testimony quoted in footnote 3, above) and the lack of any evidence in the record of what the financial assets consisted of and who owned or contributed those assets to the marriage prior to the Separation Agreement. Indeed, there is no evidence in the record of any actual transfer of any financial assets from Elyse's name or joint name to Mark alone, either before or after the Separation Agreement.

(6) Paragraph 3 recites that the parties "have transferred and conveyed to the wife the marital residence." This recitation of a transfer in the past tense would have been accurate if the Separation Agreement were executed as of a date in December 1994, but it was not accurate as of February 3, 1994. When questioned on this anomaly, Mark, and in her turn Elyse, testified that on February 3, 1994, in a fit of rage, Mark tore up a deed which had previously been executed. No explanation was offered for the subsequent preparation and execution purportedly on April 14 of the 1994 Deed, shortly before the parties' reconciliation and termination of their separation.

(7) The parenthetical sentence at the end of paragraph 3 states "(A schedule of the assets so conveyed is annexed hereto as an exhibit.)." The schedule obviously would have been of signal importance to a *bona fide* separation agreement. No schedule was annexed to the copies of the Separation Agreement produced by the Kovlers in discovery and marked at the depositions and in evidence. No copy of the schedule was ever produced to plaintiffs. Mark testified at the trial that there was a schedule which he created on his computer using financial software, but that the schedule had been lost and he could not reproduce it from the computer because he no longer had the machine he used in 1994.[5]

---

4. Paragraph 3 provides as follows:

3. That prior to the execution of this Agreement, the parties have amicably and with full knowledge of the joint property owned by them as a unit, regardless of the manner in which the asset was titled, and with the full knowledge of the separate property owned by each, have transferred and conveyed to the wife the marital residence known as and by 6 Ryder Road, Briarcliff Manor, Town of New Castle. New York; and to the husband the balances of any and all bank, investment or stock accounts owned by the parties. The parties agree and acknowledge that the transfer described in this paragraph gives to each party an equal equity interest in the assets conveyed. (A schedule of the assets so conveyed is annexed hereto as an exhibit.)

5. Mark testified as follows (Trial Tr. 20–21):

Q How did you do the schedule, sir?
A There was a tape for financial software that based on what was inputed [sic], we offered it as a schedule.
Q That was on the computer?
A That was on the computer.
Q So why was it that you couldn't make another copy from the software?
A I know that the machine that I had used back in 1994 I no longer have. It's an ancient or relatively older machine. I thought I prepared it but, perhaps. I did not. I really don't recall sir at this time.
Q And when did you—did you fill that sheet out?
A Yes.
Q In 1994?
A I don't recall, sir.

**250**

However, Mark subsequently testified that he could not remember if the schedule was printed or handwritten (Trial Tr. 202, 203). But he had previously testified at a deposition that the schedule annexed to the Separation Agreement was not printed or generated by a word processor, but was handwritten on the back of an envelope or a piece of paper (Trial Tr. 204). Elyse testified with respect to the schedule that she had seen it and that "[I]t looked like a crumpled piece of paper or an envelope with Mark's handwritten notes as to some assets that we both had. That's all I remember" (Trial Tr. 453). This conflicted with her prior deposition testimony in which she swore that she did not recall ever seeing the schedule (Trial Tr. 454–55):

Q What was on that schedule?

A I don't know. I don't ever recall seeing it.

Q What assets were transferred pursuant to this agreement?

A I don't know. I never did anything relating to money. He managed the money.

\* \* \*

A I don't recall ever seeing this annexed exhibit [the schedule].

\* \* \*

A I don't recall seeing it.

(8) Paragraphs 14 and 15 of the Separation Agreement recite that Mark's income was $80,000 per year, and Elyse's income was approximately $12,000 per year. Despite this disparity in earning power, paragraph 16 states "The husband and wife agree that each is possessed of comparable professional skills to earn a living without the financial support of the other, there shall be no maintenance paid each to the other."

(9) The Kovlers had two children, Jessica Rachel and Avery Isaac, who became ten and seven, respectively, on July 31 and October 4, 1994. Paragraph 22 provides that the custody of the children "shall be joint custody," with no provision for whether the children would live with Mark or Elyse in their purportedly separate habitations and no provision for visitation rights.

(10) The Separation Agreement does not contain any provision allocating financial responsibility for the support and maintenance of the children, a critical provision in a separation agreement such as this.

(11) Notwithstanding paragraph 16, which nullified any obligation of Mark to provide support or maintenance to Elyse, and the lack of any provision respecting support and maintenance of the children, the Kovlers both testified that during the separation Mark controlled the family finances and paid all the Ryder Road Property mortgage and other expenses and paid the ongoing family household expenses, just as he did before and after the separation.

(12) As noted above, all of the blank dates on the Separation Agreement (one on page 1 and three on page 6) are dated February 3 in Mark's handwriting. In her deposition, Elyse testified that she recalled signing the Separation Agreement on February 3 and that it was notarized before and signed by the notary public, Thomas Katz, at the same time, on February 3 (Trial Tr. 447). Discovery of Thomas Katz, however, revealed that this testimony was false. Katz did not become a notary public and did not purchase his notary stamp until

Q But you created the schedule in 1994? A Yes.

November 1994. Katz did not and obviously could not have notarized the Separation Agreement in February.[6] At the trial, further contradicting her deposition, Elyse testified that neither the Katz notarizations nor, to her "best recollection," the "Sworn to ..." legends were on page 6 of the Separation Agreement when she signed it on February 3 (Trial Tr. 551–52).

(13) Katz testified at his deposition held on July 13, 1997[7] that he did sign the notarization box and affixed his notarial stamp following the signatures of both Mark and Elyse, that he did not notarize the Kovlers' signatures on February 3, 1994 and that the February 3 date is not in his handwriting. In response to the question whether he placed his signature and notarial stamp on the page and then handed the document back to Mark and Elyse without the dates being recorded in the notarial blocks, Katz testified:

It appears that that was done because I don't recall putting those dates in and I know that those dates are not in my handwriting. (Katz Dep. Tr. 128; *see generally* at *id.* at 123, 132.)

Katz' testimony left much to be desired. Consider, for example, the following at Katz Dep. Tr. 130:

Q. ... if the date was filled in as it is right here stating, "Sworn to before me on the 3rd day of February, 1994," would you have placed your stamp before that line filled out with those dates and then written your name above that line for Mark Kovler?

A. Good question. I don't know. I don't remember.

Q. The question, sir, is would you create a phony document yourself?

MR. GINSBURG: Objection.

A. Not intentionally. I did not intend to, but your question obviously presents to me the thought of whether I did or didn't, and I don't recall. I don't think—I would like to think I wouldn't, but I don't know.

Even Katz' notarial stamp reflects an anomaly. The last line of the stamp states, as do all such stamps, "My Commission Expires 10/31/__." The blank in both stamps on page 6 is filled in with the year 1994, which is obviously wrong.

(14) Mark's testimony concerning the date(s) of signing and notarizing the Separation Agreement compounded Elyse's tergiversation concerning these issues. Mark testified that he and Elyse signed the Agreement on February 3, 1994 (Trial.Tr. 352). He explained the anomaly of notarization more than nine months after the Kovlers' purported signature in February by testifying, in substance, that in or about November 1994 he ran into a lawyer of his acquaintance with some experience in the matrimonial field who advised Mark at a restaurant on Madison Avenue that separation agreements had to be notarized (*see* Trial Tr. 354 *et seq.*).[8]

---

6. Confronted with this glaring contradiction between her deposition testimony and the facts. Elyse's only explanation at the trial was "I'm saying to you [plaintiffs' counsel] with all due respect, you badgered the during the deposition as your husband [plaintiffs' other counsel] did. I reached the point as a human being that I became angry and bellig-erent. And I didn't want to further answer your questions" (Trial Tr. 447).

7. Katz' testimony at the trial was excused by both parties by reason of his illness at the time of the trial.

8. In fact, the Domestic Relations Law does not require that a separation agreement be sworn to in the manner of an oath by the

The name of this lawyer "that I knew that had experience with [matrimonial law]" (Trial Tr. 355) was Brian Sumner, whose name Mark spelled out at trial "S–U–M–N–E–R" (Trial Tr. 356–57).[9] At a prior deposition, however, Mark spelled out the name of his matrimonial attorney friend "S–O–M–E–R" (Trial Tr. 358).[10] After receiving this advice from attorney Sumner, or Somer, Mark says that he took the Separation Agreement, inserted it into his word processor and inserted the legend "Sworn to before me this _____ day of _____ 1994" after both his and Elyse's signature line.[11] Mark testified that he interlineated by hand the date February 3, 1994 in the "Sworn to ..." notarial legends before Katz · notarized his and Elyse's signatures in late November or December, and that Elyse was not present at the time Katz

notarized the document (Trial Tr. 366 *et seq.*).

(15) Despite numerous requests during the District Court Action and the adversary proceeding in this Court, the Kovlers have never produced the original of the Separation Agreement. The significance of this failure is transcendent in a case such as this, where resolution of the conflicting testimony of the witnesses might depend upon examination of the original document.

(16) Assuming the parties were separated in early 1994, the Kovlers were reconciled and Mark moved back to the family home sometime in May 1994, never again to separate. The question was put to Mark whether the Separation Agreement had any efficacy or legal significance after the reconciliation in May 1994, and his unequivocal answers were that it had no legal significance after the

signatories, which would entail a "Sworn to ..." legend such as appeared on the Separation Agreement, it requires that a separation agreement be "subscribed by the parties thereto and acknowledged and proved in the form required to entitle a deed to be recorded." DRL § 170(6). A notarial acknowledgement is far more detailed, requiring the notary to testify personally to the signatory's identity, free execution of the instrument and date of execution. The heightened requirement of an acknowledgment guards against precisely this sort of duplicitous manipulation. Indeed there is no "anomaly"—it is clear that the Separation Agreement was back-dated.

9. Surprisingly, earlier in the trial Mark was asked "Who is Brian Summer?" to which he replied "I don't recall the name, sir" (Trial Tr. 264).

10. Plaintiffs' counsel later submitted in evidence a letter from the New York Office of Court Administration certifying that no person by the name of Brian Summer or Brian Somer appears on the roll of attorneys admitted to practice in the State of New York. In other deposition and trial testimony bearing on other issues, Mark identified two attorneys with whom he had practiced under the firm

name Mark A. Kovler & Associates by the names of Bove and Pastorini. Plaintiffs' counsel introduced another letter from the Office of Court Administration certifying that no attorney by the name of Bove or Pastorini appears on the roll of attorneys admitted to practice in the State of New York.

11. The utter impossibility of accepting this testimony as the basis for a finding of fact in the Kovlers' favor is shown by (i) the unlikelihood of being able to insert the "Sworn to ..." legends in such a manner that the insertions aligned both in spacing and at the left margin so perfectly with the rest of the printed matter on page 6 that one could not discern that the legends had not been on the document when originally produced, (ii) the brond spacing between Mark's and Elyse's signature lines, exokucabke in a machine-produced document only if the "Sworn to ..." legend between the signature lines was present in the original and, of course, (iii) Mark's palpably fabrieated testimony about his phantom attorney acquaintance, whose name he could not remember at all (footnote 9), whose name he could not remember how to spell from one sworn testimony (deposition) to another (trial), and whose name by any spelling is unknown to the Office of Court Administration (footnote 10).

reconciliation.[12] Immediately after this series of questions and answers at Trial Tr. 156, Mark was asked what purpose would be served by filing the 1994 Deed purportedly signed by the parties pursuant to the Separation Agreement if the Separation Agreement had become null and void by reason of the Kovlers' reunification:

Q So, why in September, sir, were you bothering your brother-in-law to convey the property that hadn't been conveyed under the separation agreement if it was null and void (Trial Tr. 156).

The witness did not fully answer this question and the interrogation diverged into other matters and was interrupted by another witness. The following day, however, plaintiffs' counsel took up the question again and Mark testified, directly contrary to his testimony quoted in footnote 12, that the Kovlers' reconciliation in May 1994 did not render the Separation Agreement null and void, and that many provisions of the Separation Agreement continued in effect. (*See* Trial Tr. 246 *et seq.*)

## B. *The 1994 Deed*

Like the Separation Agreement, the 1994 Deed and the Real Property Transfer Report, required to be filed with the Deed, bear significant anomalies on their face and are the subject of striking contradictions in testimony by the Kovlers. The following points are significant in the Court's assessment of the *bona fides* of the 1994 Deed:

(a) Preliminarily, it should be noted that the original copy of the 1994 Deed was not produced by the Kovlers until the morning of the third day of trial in this adversary proceeding, November 10, 1999, despite the representation of plaintiffs' counsel, which this Court accepts as truthful, that plaintiffs' counsel had made repeated requests for production of the original during the District Court Action and this adversary proceeding. The original deed, stapled to the Westchester County Recording And Endorsement Page, was produced in a "Jonathan A. Diller, Attorney at Law" envelope marked in pencil on the front "DEED TO RYDER ROAD." At trial on November 10 Mark testified concerning the Kovlers' search late into the night of November 9–10 which resulted in their finding the original in the Jonathan A. Diller envelope in one of Jonathan Diller's old files, which Elyse had taken possession of after Diller's death in October 1995.[13]

---

12. In a December 1997 deposition Mark testified as follows (Trial Tr. 369–70):

Q The terms of [the Separation Agreement] were no longer in effect [after the separation ended]. Right?
A To the extent that I moved back in, I guess it would have rendered it pretty foolish.

In addition, Mark testified at trial (Trial Tr. 156):

Q I wasn't asking you but you were—by September you were reunited with your wife.
A That is correct.
Q You were living back with her in the marital home; right?
A By September of '94 I was back in Westchester, yes, sir.
Q You had given up—withdrawn. The separation agreement was no longer in effect; right?

[Objection]
A No. I don't—I didn't deem it to be in effect at that time.
Q Mr. Kovler, [unintelligible] the bankruptcy.
A I think I answered your question, did I not?
Q When you testified previously, you stated that as soon as you moved back with your wife at the end of May, that the separation agreement was null and void and that's true; right?
A I believe once I moved back that the separation agreement was no longer operative. That's correct.

13. *See* Trial Tr. 371–72 ("... it was in a file labeled with Mr. Diller's name.... It was the last place that one would look for it"): *see* Elyse at *id.* 426–28.

One can only wonder how the Kovlers obtained a copy of the 1994 Deed and Westchester County Recording And Endorsement Page for production in the District Court Action if the originals of these documents lay in an envelope in Jonathan Diller's files undiscovered until the wee hours of the morning of November 10, 1999.

(b) The 1994 Deed was filed in the County Clerk's Office on December 20, 1994, as documented by the Westchester County Recording And Endorsement Page and acknowledged in the Kovlers' testimony.

(c) The 1994 Deed is a standard Blumberg form deed printed on both sides of the form. The blanks on the obverse side are entirely typewritten except for the date and the signatures. The first line on the obverse side is imprinted "THIS INDENTURE, made the ___ day of ___, nineteen hundred and ___." The blank spaces in this line are not typewritten, but filled in by Mark in his handwriting in black ink "14 ... APRIL ... ninety-four."

(d) The reverse side of the Blumberg form 1994 Deed contains the following printed acknowledgement form: **STATE OF NEW YORK, COUNTY OF** ___ ss:

On the ___ day of ___ 19 ___, before me personally came ___ to me known to be the individual ___ described in and who executed the foregoing instrument, and acknowledged that ___ executed the same.

This acknowledgment was notarized by one Naomi Smook who signed her signature over her notary public stamp and filled in the blanks "Westchester," "199*4*," "Mark A. Kovler and Elyse H. Kovler," "individuals," "that *they* executed the same" and the date of expiry of her notary public commission, all in *blue* ink. The only blanks in the form which Smook did not fill in were the date blanks "*14* day of *APRIL*," which were filled in by Mark using black ink. (Trial Tr. 162–63).

(e) The Real Property Transfer Report was filled in by Smook in her handwriting (although it does not bear her name or signature). The only portions of the Real Property Transfer Report not filled in by Smook were item 12 "Date of Sale/Transfer," filled in "04/14/94," the signatures of Elyse and Mark and the dates following both signatures, both of which were filled in "4/14/94," all of which (except Elyse's signature) were handwritten by Mark (Trial Tr. 170–71).

(f) Elyse was less than helpful in her testimony concerning the time and circumstances of her signing the 1994 Deed. In response to the question "Where were you when the deed was signed?", Elyse testified "I think—and I don't know what Ms. Smook said yesterday——I could be wrong——she and my brother drove to my house. That's what I've been thinking as I'm sitting here today" (Trial Tr. 458). Further questions elicited evasive hypothetical answers such as "It would have to have been early to late evening because of everybody's work schedule. But that's what I think would have happened" (Trial Tr. 458) and "I believe that they drove up in the evening" (*id.* at 460). When pressed by the Court with the question, "Now, do you really have a present recollection about what did happen as opposed to what you think might have happened?" Elyse finally testified "To be on the safe side, then I would say I don't have a present recollection" (*id.* at 460).

(g) Smook, in 1994 a real estate lawyer who lived and worked in New York City, and Diller "were essentially very good friends" (Trial Tr. 265). When asked how she came to nota-

rize the 1994 Deed for the Kovlers, Smook responded "I don't exactly remember ... I just can't recall when we did that" (*id.* at 266). She did not recall being asked to come to the Kovler home to execute the Deed or being in the Kovlers' home at any time to notarize the Deed (*id.* at 267; to the same effect, *see id.* at 270–71, 284). When asked "did you notarize this document [the 1994 Deed] on April 14, 1994?", she answered "I don't know. I just can't recall" (*id.* at 268). When asked "Were you at the Kovlers' home on April 14, 1994?", she answered "Not that I recall but I just have no way of knowing" (*id.* at 269). Smook's diary for April 14, 1994 made no reference to the Kovlers; the business hours for that day appear to exclude the possibility of a meeting with the Kovlers; there is an entry "5:30—7:30 N.Y. Law 47 Worth Street" and a final entry "8:30" with nothing following. It appears that the N.Y. Law 47 Worth Street entry referred to an art gallery opening which Smook recalled attending, but it was a two-day exhibition and she might have attended the following day (Trial Tr. 269). Neither Mark nor Elyse ever informed Smook in any way that they were separated, and Smook had no knowledge of a separation (*id.* at 271). Smook testified that it was her custom to include business and deal information in her diary and, at the request of plaintiffs' counsel, she located a single reference to the Kovlers in her 1994 diary, to wit, an entry on the December 9 page noting "Elyse: 914–923–1170." In response to the Court's question "Is there anything at all on your April 14 diary that suggests to you any point in the day when you might have traveled to Westchester?", Smook answered "Oh, I think it's very unlikely but it's possible. If I didn't go to the New York Law opening, I certainly had the evening free, but there's nothing in the diary that suggests that I did" (*id.* at 288).

(h) As to Smook's notarization of the 1994 Deed, in response to the Court's question "Can you tell me how it would be that the date alone among the handwriting and [*sic,* in] the notarization is not yours?", Smook answered "No, I don't know" (*id.* at 284).

(i) Aside from the fact that Mark, not Smook, filled in all the April 14 dates in the notary's acknowledgment block on the reverse side of the Deed and in the Real Property Transfer Report, both of which were otherwise completed by Smook in her handwriting, the most obvious anomaly respecting the 1994 Deed is the eight-month gap between the April 14 date and the December 20 recording. Mark provided two quite contradictory explanations. At trial Mark testified that after the Deed and Real Property Transfer Report were signed and notarized on April 14 in the presence of Jonathan Diller, he gave these documents to Diller and asked Diller to record the Deed in the Westchester County Clerk's Office. When he received the Town real property tax bill in September with his name on it, he realized that Diller had not filed the Deed, and he called Diller about getting the Deed filed (Tr. 152–55). This explanation appears unlikely on its face, since Diller (a trial attorney, not a real estate lawyer) lived and worked in New York City, whereas both Mark and Elyse lived and worked in Westchester and both had real estate experience and could have filed the deed in Westchester much more easily than Diller. In any event, this explanation was flatly contradicted by Mark's deposition testimony, in which he stated that he did not dis-

cover that the Deed had not been filed until December, when he found it in *his own* files in connection with his annual tax preparation. *See* Trial Tr. at 195–200.[14]

(j) Bearing in mind that the rationale for the *bona fides* of the 1994 Deed was that the transfer to Elyse was effected pursuant to the Separation Agreement, the question naturally arises why it was important to record the Deed seven months after the parties' separation had ended, particularly in light of Mark's deposition testimony that the reconciliation and end of separation in May 1994 rendered the Separation Agreement "no longer operative," in Mark's own words (Trial Tr. 156). In this connection, reference is made to the text in item (16) and footnote 12, above.

### C. *The Credibility of Mark and Elyse*

 It is universally recognized that deportment and demeanor are significant in assessing the credibility of a witness. Indeed, triers of fact, whether judges or jurors, often must decide weighty issues of consequence to the parties based solely on a witness' body language, eye contact, manner of speech and a host of subtle, intangible signals conveyed by behavior on the witness stand. The demeanor of both Mark and Elyse, as witnessed by the Court during the trial, did much to undermine the Court's confidence in both the care and the truthfulness which each brought to the witness stand.

As important as demeanor may be, the consistency of a witness' testimony under oath at different times, or the lack of it, may provide more dramatic and palpable evidence of truthfulness or fabrication. Even a single instance of material inconsistency may be sufficient to tilt the balance of credibility in a close case. The evidence in this trial was indeed dramatic, although not close. Time and time again the testimony under oath of both Mark and Elyse on matters of fact which were not only material but critical to the question of the *bona fides* of the Separation Agreement and the 1994 Deed was confounded by prior deposition testimony in direct contradiction. Many instances of the Kovlers' contradictory testimony under oath have already been identified in the Court's summary of the evidence concerning the Separation Agreement and the 1994 Deed. But the trial record contains numerous other instances of irreconcilable conflicts in the testimony of both Mark and Elyse.[15]

 Another well-recognized method for assessing the credibility of a witness is to examine the inherent probability, or

---

**14.** Mark testified in deposition that, after the 1994 Deed was signed and notarized on April 14, "it was sent down for recording" (Trial Tr. 197). The deposition transcript then reads (*id.* at 198):

Q Who sent it down?
A That is the problem. I thought my wife was going to do it and she thought I was going to do it.
Q One of you took possession of this document [the Deed] and either you or your wife, you're not sure
A Correct.

After Mark "came across the Deed" in the course of going through his "personal files where I would find papers I needed for taxes," Mark testified "Then it was filed" (*id.* at 199).

**15.** For example, as to Mark; deposition testimony denying ever having been sued, shown to have been false (Trial Tr. 103); deposition testimony denying employment at Empire State during the relevant period, shown to have been false (*id.* at 148); trial testimony that he had not recorded deeds before the 1994 Transfer, shown to be false (*id.* at 324–25); deposition testimony that he did not think he prepared the 1994 Deed and did not recall who prepared it, later conceded to be false (*id.* at 318–19); evasive (at best) answers concerning the handwriting dating the 1994 Deed and acknowledgment on the reverse side, which Mark eventually acknowledged was entirely in his handwriting (*id.* at 310–17). As to Elyse: unequivocal deposition testimony denying her signature on a number of documents, which she subsequently testified unequivocally were signed by her (*id.* 473–76, 500–13).

lack of probability, of the particular facts propounded by the witness, considered in the light of all of the facts and circumstances in the record before the trier of fact, applying ordinary common knowledge of human nature and common sense as the measure of probability. The fundamental inquiry in this method of analysis is whether there is a rational basis to find the facts as posited by the witness whose credibility is at issue, given all the facts and circumstances presented to the trier of fact. Simply put, does the Kovlers' story (or stories) make sense? The Court's analysis of the evidence in points IV A and B, above, speaks for itself. Suffice it to say that the Kovlers' contentions with respect to the Separation Agreement and the 1994 Deed and Transfer do not pass muster under the "probability" test.

Based upon the three criteria referred to in this section, it is clear to this Court that Mark and Elyse Kovler are not worthy of belief and, consequently, that their testimony under oath is insufficient evidence on which to base findings of fact. It does not follow from this that the Court has automatically rejected the Kovlers' testimony or made findings without giving any consideration to their testimony. It does mean that the Kovlers' testimony, by itself, has been deemed insufficient to carry the burden of proof, where the Kovlers have the burden of proof, in the absence of independent corroborating evidence or circumstantial evidence to support a finding.

### D. Ultimate Findings and Conclusions on the Kovlers' Bona Fides Defense

As noted above under point III, plaintiffs sustained their burden of proof under D & CL § 276, having established under the "badges of fraud" analysis their *prima facie* case that Mark and Elyse effected the 1994 Transfer with intent to "hinder, delay or defraud present or future creditors." The burden then shifted to the Kovlers to rebut the inference of actual intent to defraud. Their defense was based upon the alleged *bona fides* of the Separation Agreement and the 1994 Deed. They ask the Court to find as facts that they entered into the Separation Agreement in February 1994, that the 1994 Deed was executed in April pursuant to the terms of the Separation Agreement and that the 1994 Transfer was truly for the purpose of resolving the Kovlers' matrimonial difficulties, and not for the purpose of hindering, delaying or defrauding creditors, thereby rebutting the inference or presumption of intent to defraud resulting from the "badges of fraud" analysis.

On the evidence before the Court, it is my conclusion that the Kovlers have failed to sustain the burden of proof on their *bona fides* defense. Indeed, even if the burden were on plaintiffs to disprove the *bona fides* defense, the evidence before the Court affirmatively establishes, not merely by a preponderance but under a clear and convincing standard, that the Separation Agreement and the 1994 Deed constituted an integral part of the Kovlers' attempt to defraud creditors. This conclusion is based upon all of the facts and circumstances detailed in paragraphs (1) through (16) under heading A, above, concerning the alleged separation and the Separation Agreement, and paragraphs (a) through (j) under heading B, above, concerning the 1994 Deed, and the footnotes thereto.

Paragraphs (1) through (16) compel the following findings with respect to the alleged separation and the Separation Agreement:

- There is no evidence, other than the Kovlers' testimony, that Mark and Elyse actually did undergo a genuine marital separation in 1994, either for three-four months or "a few weeks." The evidence summarized in paragraphs (1), (3) and (4) tends to refute the existence of a genuine marital separation.

- Paragraphs 3 and 4 of the Separation Agreement and the testimony and conduct of the parties with respect thereto, set forth in paragraphs (4), (5), (6)

and (7), do not accord with the common experience and expectations of ordinary people involved in the task, critically important to both spouses, of dividing the marital assets. The same may be said with respect to the provisions of the Separation Agreement and the facts set forth in paragraphs (8), (9), (10) and (11). The point here is not Mark's incompetence in drafting the Separation Agreement; it is that people of ordinary intelligence, whether lawyers or not, ordinarily would not be expected to rely on such patently inadequate contractual provisions to govern their financial and family relations in a matter of such gravity as a marital separation, especially where the interests of minor children are at stake.

- There is no evidence, other than the testimony of the Kovlers, that the Separation Agreement was prepared or signed in February 1994.
- The Separation Agreement was "notarized" by Robert Katz after November 11, 1994.
- The notary legend signed by Katz "Sworn to before me this 03 day of February, 1994" was false.
- The false dates handwritten in the notarizations for Mark's and Elyse's signatures were written by Mark after November 11, 1994.
- Mark's testimony explaining the notarization of the Separation Agreement in late November or December by reference to advice received from his attorney acquaintance Brian Sumner, or Somer, was false. The Office of Court Administration has confirmed that there is and was no such attorney. See text in item (14) and footnotes 9, 10, 11.

The following findings with respect to the 1994 Deed are compelled by the evidence and findings set forth in paragraphs (a) through (j):

- The April 14 date handwritten in Naomi Smook's acknowledgment on the reverse side of the 1994 Deed was written by Mark.
- All of the handwritten dates 4/14/94 appearing on the Real Property Transfer Report, otherwise completed in the handwriting of Smook, were written by Mark.
- Aside from the testimony of the Kovlers, there was no evidence that the 1994 Deed was signed by Mark and Elyse on April 14.
- After evasive answers, Elyse testified that she had no recollection that the 1994 Deed was notarized on April 14.
- Smook repeatedly and steadfastly refused to testify that she signed the acknowledgment on the 1994 Deed on April 14. When asked if she was at the Kovlers' home on April 14, she answered "Not that I recall...." When asked if there was anything in her April 14 diary suggesting that she traveled to Westchester, Smook answered "Oh, I think it's very unlikely ... there's nothing in the diary that suggests that I did."
- The only reference to the Kovlers in Smook's entire diary for 1994 was a reference on December 9 to "Elyse: 914-923-1170," which is Elyse's telephone number.
- The 1994 Deed was recorded on December 20, 1994.
- Mark gave two explanations for the purported delay in recording the Deed from April to December 20: one that he gave the Deed to Jonathan Diller after signature in April and Diller did not file it until December; the other that Mark thought Elyse would file the Deed and she thought he would file it, and it turned up in December in Mark's files, whereupon he had it recorded. At least one of these contradictory explanations was necessarily false. I find that both were false.
- Once the separation (if ever there was a separation) ended in May 1994, the February 3, 1994 Separation Agree-

ment (if there was such an Agreement) "was no longer operative" (Mark's words). Consequently, the Separation Agreement cannot have been the reason for recording the 1994 Deed (even assuming that the Deed had been signed on April 14).

Upon the foregoing, this Court has reached the following **ULTIMATE CONCLUSIONS OF FACT:**

1. Mark prepared the Separation Agreement and the 1994 Deed in or about November or December 1994.

2. Mark procured Katz to notarize Mark's and Elyse's signatures on the Separation Agreement on some date after November 11, 1994, with the false date of February 3, 1994 inserted by Mark either before or after Katz' signature over Katz' notarial stamps.

3. Mark procured Smook to prepare the Real Property Transfer Report and to notarize the acknowledgment on the reverse side of the 1994 Deed at some time on or after December 9, 1994, the date of the reference in Smook's diary to "Elyse."

4. The date 4/14/94 appearing in several places on the Real Property Transfer Report and the April 14 date in the acknowledgment on the 1994 Deed all were false and were written in by hand by Mark, either before or after the preparation by Smook of the Real Property Transfer Report and the signature by Smook of the acknowledgment on the Deed.

5. Mark gave false testimony concerning the foregoing matters in depositions in the District Court Action and in depositions and at trial in the adversary proceeding in this Court.

6. Mark did the foregoing things initially in order to divest himself of ownership of, and thereby remove from the reach of his present and future creditors, his interest in the Ryder Road Property, and subse-

quent to the 1997 Deed in order to defeat plaintiffs' damage claim under D & CL § 276–a.

7. Elyse knowingly and actively participated in the foregoing conduct of Mark by signing the Separation Agreement and the 1994 Deed in November and December 1994 and by giving false-testimony in depositions in the District Court Action and in depositions and at trial in this adversary proceeding, with the same purpose and intent as Mark.

## V. *Findings and Conclusions on the Lurie Claim*

The Lurie Claim was contested by Mark in the Joint Pretrial Order. However, Mark did not submit any testimony or documents or even argument in opposition to the Lurie Claim at the trial.

Accordingly, based upon the uncontested evidence before the Court, I find that Mark, then acting as attorney for Linda Lurie, held $1,000 of Lurie's money in escrow for her benefit and that Markhas failed to repay the $1,000 to Linda Lurie, or to pay it to a third party for her benefit, or to otherwise account for his stewardship and disposition of the $1,000, despite due demand therefor.

## VI. *Dischargeability of the Fraudulent Conveyance Claim*

Having found the Kovlers' conveyance of the Ryder Road Property to be an actual fraudulent conveyance under D & CL § 276, the issue remains whether any claim, including attorneys' fees mandated under D & CL § 276–a, arising from that fraudulent conveyance is nondischargeable under either of Sections 523(a)(2)(A) or (a)(6). I conclude that the claim is nondischargeable under both.

### *Section 523(a)(2)(A)*

Gentry relies on the Supreme Court's recent decision in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), for the proposition that her claim

for statutory attorneys' fees is nondischargeable under Section 523(a)(2)(A). While it is true that *Cohen* holds that punitive damages and attorneys' fees are nondischargeable under Section 523(a)(2)(A) as part and parcel of the injury to the creditor. *Cohen* presupposes the nondischargeability of the underlying obligation. The threshold issue of whether Section 523(a)(2)(A) is applicable to the Kovlers' fraudulent conveyance must be resolved.

Section 523(a)(2)(A) provides in relevant part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

■ At issue then is whether the Kovlers "obtained" property by "false pretenses" within the statute's meaning. While the facts of this case may not neatly fit a paradigmatic construction of obtaining property by false pretenses, the reality of this case compels a finding of nondischargeability.

It is too facile to say that the property "obtained by" the Kovlers was property they already possessed. The focus of Section 523(a)(2)(A)'s nondischargeability provisions must center on the harm caused to the creditor. Mark intentionally conveyed his major asset in order to make it unavailable to creditors. By divesting himself of bare legal title while retaining all other indicia of ownership (possession, use, control) Mark did in fact "obtain" for himself and Elyse (or would have but for Gentry's successful suit under D & CL § 276) property which would otherwise have been available for Mark's creditors. Stated dif-

ferently, what the Kovlers "obtained" by the transfer was property *free from creditors' claims*. In so doing, they obtained something *from their creditors*.

■ As expressed in 1570 in Statute 13 Elizabeth, Ch. 5, the ultimate source of modern fraudulent conveyance law, the very purpose of the doctrine is:

For the avoiding and abolishing of feigned, covinous and fraudulent feoffments, gifts, grants, alienation, conveyances, bonds, suits, judgment and executions ... which ... are devised and contrived of malice, fraud, covin, collusion or guile, to the end purpose and intent, to delay, hinder or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, heriots, mortuaries and reliefs.

The fundamental intent of fraudulent conveyance law has not changed in the last four hundred-odd years. The Kovlers' deprivation of their creditors' rights is sufficient to satisfy both the spirit and the letter of the word "obtained." The policy of a fresh start for the honest debtor is not advanced by resort to an unnecessarily narrow and hypertechnical statutory construction to benefit a palpably dishonest debtor.

■ Section 523(a)(2)(A)'s requirement of "false pretenses, a false representation, or actual fraud ..." is also unquestionably satisfied here. The Kovlers' misconduct was not classic five-fingered "actual fraud," but they most certainly committed "false pretenses" and "false representation" by any definition. The customary five elements required to establish "actual fraud" need not be shown to establish either "false pretense" or "false representation" since the statutory language "false pretenses, a false representation, or actual fraud" cannot be read as redundant descriptions of but one harm. "The use of the disjunctive 'or' evidences that Congress intended to deny a discharge under any one of the three types of mischief

referred to." *In re Soliz,* 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996).

The meaning of false representation needs no analysis and the Kovlers' numerous false statements to buttress the asserted *bona fides* of the 1994 Transfer have been fully documented.

██ The mischief referred to by false pretenses " . . . has been broadly construed by the courts." *Id.* The Supreme Court in *Field v. Mans* noted, "[t]he operative terms in § 523(a)(2)(A) . . . carry the acquired meaning of terms of art. They are common law terms, and . . . they imply elements that the common law has defined them to include." *Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (looking to the Restatement (Second) of Torts for the prevalent common law definition of "actual fraud"). While the Restatement (Second) of Torts lacks any convenient definition of false pretenses, the term has been defined in law digests as "any trick or device whereby the property of another is obtained." 37 Am.Jur.2d Fraud and Deceit § 2 (1968). Bankruptcy courts have applied the following definition: "As used in Section 523(a)(2)(A), 'false pretenses' means implied misrepresentations or conduct intended to create and foster a false impression." *In re Bozzano,* 173 B.R. 990, 993 (Bankr.M.D.N.C.1994) (and cases cited therein). Moreover, "[a] 'false pretense' is established or fostered willfully, knowingly and by design; it is not the result of inadvertence." *In re Dunston,* 117 B.R. 632, 641 (Bankr.D.Colo.1990), *aff'd in part, rev'd in part,* 146 B.R. 269 (D.Colo.1992).

██ "False pretenses" for purposes of Section 523(a)(2)(A) then may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective.

██ The notion of calculatedly misleading acts is significant in examining the Kovlers' actions. This is not merely a case of a transfer of assets in derogation of creditors' rights. This is a case in which two attorneys knowingly conspired to defraud their creditors and took elaborate measures to mask their actions through falsifying conveyance records, fabricating and back-dating a purported separation agreement and procuring notarial misconduct, all supported by repeated false swearing in court proceedings. In sum, the Kovlers' actions evidence a conscious orchestration of deceptive or misleading conduct calculated to obtain, or deprive another of, property. As such, I find that their fraudulent conveyance of the Ryder Road Property, when coupled with their contemporaneous and subsequent acts taken to misrepresent the true nature of the transaction, constitute "false pretenses" within the meaning of Section 523(a)(2)(A).

██ This conclusion should not be read to signal that any instance of an actual fraudulent conveyance will fall within the scope of Section 523(a)(2)(A). It is entirely conceivable that a fraudulent conveyance could be carried out openly and notoriously, with no effort at all made to disguise the transaction. In such an instance, the "obtained by" requirement of Section 523(a)(2)(A) might be satisfied, but false pretenses would not have been employed either to effect the conveyance or to conceal it after the fact. On the facts of this case, however, the application of Section 523(a)(2)(A) is appropriate.

Turning to the issue of the nondischargeability of Gentry's statutory attorneys' fees incurred in pursuing the Kovlers, the authority of *Cohen v. de la Cruz* is directly controlling. Gentry's attorneys' fees were incurred as a direct consequence of the Kovlers' fraudulent conveyance and are therefore nondichargeable under Section 523(a)(2)(A). *Cohen v. de la Cruz,* 523 U.S. at 219–220, 118 S.Ct. at 1217.

### *Section 523(a)(6)*

██ The Kovlers' actions also give rise to a nondischargeable debt under Section

523(a)(6) "for willful and malicious injury to another entity or to the property of another entity." On the record established in this case, it is clear that the Kovlers' fraudulent conveyance of the Ryder Road Property was specifically calculated to frustrate Gentry's rights as a creditor. As such, the Kovlers' acts satisfy the two-pronged showing of both willful and malicious conduct required under Section 523(a)(6). *In re Krautheimer*, 210 B.R. 37, 47 (Bankr.S.D.N.Y.1997).

■■■ "Willful" requires a showing of an act done deliberately or intentionally, *In re Blankfort*, 217 B.R. 138, 142 (Bankr. S.D.N.Y.1998), a standard easily satisfied in this case. The Kovlers' acts can in no sense be considered negligent or inadvertent.

■■■ "Malicious" means wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. *In re Stelluti*, 94 F.3d 84, 87 (2d Cir.1996); *Blankfort*, 217 B.R. at 143–44 (proof of actual, malevolent intent to inflict injury, or "Biblical malice", is not required, but a showing of aggravating circumstances evidencing willful conduct so reprehensible as to warrant exception to the "fresh start" policy is required).

Here, the Kovlers' conduct rises to a sufficiently egregious and willful level to warrant a finding of "malice" under Section 523(a)(6).[16] *See e.g., Stelluti* at 87–88 (debtor's transfer of $480,000 in vehicle sales proceeds from wholly-owned company account to a personal account located out of state in knowing derogation of creditor's rights held nondischargeable under Section 523(a)(6) as willful and malicious). That Elyse transferred Mark's interest in the Ryder Road Property back to Mark on July 30, 1997, after more than a year of costly and acrid litigation and damaging revelations in discovery in the District Court Action, and on the eve of the Kovlers' first bankruptcy filing, does not in any way support a finding of lack of intent to defraud, as argued by the Kovlers. Mark and Elyse did what they did and their conduct remains a willful and malicious attempt to injure Gentry's interests as a matter of fact and law.[17]

There can be no doubt that Gentry's D & CL § 276–a claim for attorneys' fees is nondischargeable under Section 523(a)(6) under *Cohen v. de la Cruz.* Although decided on the basis of Section 523(a)(2)(A), *Cohen* compels the conclusion that an award of attorneys' fees is nondischargeable under Section 523(a)(6) where those fees were incurred as a result of conduct giving rise to the nondischargeable debt.

In *Cohen*, the debt at issue arose from the debtor's violation of a local rent control

16. Were it necessary, the record would support a finding of fact that Mark's conduct toward Gentry, including the 1994 Transfer and the fraudulent conveyance litigation, was in part motivated by actual malice, based upon Mark's own deposition testimony as to his antagonism toward Gentry (Trial Tr. 108–113) and upon the compelling evidence (exemplars of Mark's handwriting) that Mark sent in literally dozens of subscription forms in Bettijaine Gentry's name for magazines, commemorative dishes and other artifacts, services, etc. (including even a Rolls Royce rental) during a several month span of time, requiring Gentry to expend countless hours canceling thousands of dollars worth of subscriptions fraudulently made in her name. (Trial Tr. 565–570; Pl. Exs. 85–90, 94A, B: *cf.* Mark's denial at Trial Tr. 114–119). Having observed the Kovlers during a week of trial, there is simply no doubt that the relationship between them and Gentry and her counsel was one of intense, mutual, personal animosity dating from at least 1993 when Gentry filed her grievance against Mark.

17. To the extent that contrary authority exists regarding the applicability of Section 523(a)(6) to an actual fraudulent conveyance in the Ninth Circuit's decision in *In re Saylor*, 108 F.3d 219 (9th Cir.1997), affirming the Ninth Circuit Bankruptcy Appellate Panel at 178 B.R. 209, this Court declines to follow it. A principal factor in the *Saylor* decisions was the fact that no "debt" insofar as a present monetary claim existed against the debtor, merely a right of avoidance under California law. 178 B.R. at 213. Here by contrast. DC & L Section 276–a expressly posits a monetary recovery for attorneys' fees engendered by the fraudulent conveyance.

ordinance. Tenants of the debtor prosecuted an adversary proceeding claiming that excess rent due them and treble damages and attorneys' fees under the New Jersey Consumer Fraud Act were nondischargeable under Section 523(a)(2)(A). *Cohen*, 523 U.S. at 214–17, 118 S.Ct. at 1215. The debtor sought to confine the quantum of nondischargeable "debt ... for money, property, services ..." articulated in Section 523(a)(2)(A) solely to the rent overcharges. However, the Supreme Court read Section 532(a)(2)(A) *in pari materia* with other nondischargeability sections (Sections 523(a)(1)(B)(i), 523(a)(4), 523(a)(6) and 523(a)(9)), considering the term "debt for" as "serv[ing] the identical function of introducing a category of nondischargeable debt" and held "[w]hen construed in the context of the statute as a whole, then, § 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., including an award of treble damages for the fraud." *Id.*, 523 U.S. at 220, 118 S.Ct. at 1217. The Court concluded:

> In short, the text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt ... for money, property, services, or ... credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.

*Id.*, 523 U.S. at 223, 118 S.Ct. at 1219.

At least one court has extended *Cohen*'s *in pari materia* analysis of the term "debt for" to claims arising under Section 523(a)(6). In *Pettey v. Belanger (In re Pettey)*, 232 B.R. 543 (D.Mass.1999), the District Court affirmed the Bankruptcy Court's determination that a $750,000 consent judgment, an unspecified portion of which was attributable to attorneys' fees, was nondischargeable in full under Section 523(a)(6). After finding that the $750,000 obligation in fact arose as a result of a malicious and willful act of the debtor (rape and indecent assault of a child), the Court concluded:

> I agree. In *Cohen*, the Court specifically refers to § 523(a)(6), among other provisions within § 523(a), and says that none of these provisions use "debt for" in the restitutionary sense.... However it is put, it is clear that the $750,000 debt is "as a result of," "with respect to" and "by reason of" Pettey's sexual assault and battery of appellees. The law suit arose solely out of those acts. Accordingly I will not disturb the Bankruptcy Court's finding that the entire $750,000 is a "debt for" the injuries arising from Pettey's sexual assault and battery of appellees. The whole debt is consequently excepted from discharge.

*Id.* at 548.

When one substitutes "fraudulent conveyance" for "sexual assault and battery," the same logic applies in this case, and indeed there is no reason to meaningfully distinguish the wrongs in these two cases for purposes of Section 523(a)(6)—both constitute willful and malicious injury by the debtor to another or to the property of another, and statutory attorneys' fees recoverable as a result of those tortious acts fall with Section 523(a)(6)'s discharge exception.

## VII. *Dischargeability of the Lurie Claim*

Having found that Mark Kovler, acting as Lurie's attorney, failed to repay or otherwise account for the $1,000 he held in escrow for her despite her demand for its return, the issue of whether this claim is nondischargeable under Section 523(a)(4) is quickly resolved.

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" Mark Kovler's ac-

tions raise two issues, namely whether his retention of Lurie's funds was "defalcation" and if so, whether such defalcation occurred while he was acting in a fiduciary capacity.

"Defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud." 4 *Collier on Bankruptcy* ¶ 523.10[1][b] (15th Ed. Rev'd 1999). "[F]or purposes of Section 523(a)(4), the term 'defalcation' requires at least some element of wrongdoing on the part of the debtor/fiduciary, and ... 'innocent' or merely negligent conduct, even if held actionable in a state court, is not within the scope of the statutory exception to discharge-ability...." *In re Zoldan*, 221 B.R. 79, 88 (Bankr.S.D.N.Y.1998), *aff'd* 226 B.R. 767 (S.D.N.Y.1998); *see also In re Ellenbogen*, 218 B.R. 709, 711–12 (Bankr. S.D.N.Y.1998) citing *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937) (fiduciary's withdrawal and dissipation of funds constituted defalcation notwithstanding lower court judgment entitling him to funds, fiduciary acts at his peril where he knows that entitlement may be subsequently revoked). From the uncontested facts, it is clear that Mark Kovler failed to remit the $1,000 and that his failure to do so was more than merely negligent, particularly in light of the demand to return the funds. The "defalcation" element is satisfied.

The next element that must be satisfied is whether Mark Kovler was acting in a fiduciary capacity at the time of the defalcation. As articulated by District Judge Conner in *Zoldan:*

> The definition of fiduciary is to be narrowly construed so that it does not reach debtor-creditor transactions in which the debtor merely violated the terms of his commercial agreement with the creditor.... The meaning of fiduciary is a matter of federal law.... The broad, general definition of fiduciary, involving confidence, trust and good faith, is not applicable in dischargeability proceed-

ings under § 523(a)(4).... Section 523(a)(4) applies only to express or technical trusts. Constructive or implied trusts, or any trust where the existence of the trust is created merely on the basis of wrongful conduct (a trust ex maleficio) do not create a fiduciary relationship.... Put another away, the fiduciary relationship must exist prior to the act creating the debt; a trust relationship cannot be said to arise merely from the wrongful conduct itself.

*Zoldan*, 226 B.R. at 772–73. The attorney-client relationship is just such a pre-existing fiduciary relationship. *In re Hayes*, 183 F.3d 162, 170 (2d Cir.1999) ("... we follow the Eighth Circuit in holding that the attorney-client relationship, without more, constitutes a fiduciary relationship within the meaning of Section 523(a)(4).").

Thus, Mark Kovler committed an act of defalcation with respect to Lurie's funds while he was acting in a fiduciary capacity as her attorney. The obligation is nondischargeable under Section 523(a)(4).

## VIII. *Damages in Respect of Both Claims*

The amount of damages to be awarded in respect of both the Fraudulent Conveyance Claim and the Lurie Claim will be determined upon further submissions, if necessary, and a further hearing to be scheduled by the Court. A final order and judgment on liability and damages in this adversary proceeding will await the outcome of the hearing on damages.

\* \* \*

Chambers will contact counsel for both side to schedule the hearing on damages.